700 P.2d 488

**STATE of Arizona, Appellee,**

v.

**Ambrose Stanley CARTER, Appellant.**

No. 6413.

Supreme Court of Arizona,
En Banc.

May 21, 1985.

Robert K. Corbin, Atty. Gen. by William J. Schafer III, and Roslyn Moore Silver, Asst. Attys. Gen., Phoenix, for appellee.

Kirby Kongable, Yuma, for appellant.

HAYS, Justice.

Appellant, Ambrose Stanley Carter, was convicted of two counts of armed robbery, A.R.S. § 13–1904, class 2 felonies, and one count of aggravated assault, A.R.S. § 13–1204, a class 3 felony. The jury found that each of appellant's crimes was a dangerous offense. The jury also found that appellant had a prior conviction in Ohio for armed robbery. *See* Ohio Rev.Code Ann. § 2911.01 (Page Supp.1984). The trial judge determined that appellant was on parole from the Ohio crime at the time of the present offenses. Appellant was sentenced to life without possibility of parole for 25 years for each of these offenses.

*See* A.R.S. § 13–604.01(A). These sentences were designated to run concurrently. From these convictions and sentences, appellant appeals. We have jurisdiction. Ariz. Const. art. 6, § 5(3); A.R.S. §§ 13–4031, 13–4035. We affirm. We must address three issues:

1. Did the trial court properly refuse to suppress appellant's:

   a. Pre-arrest statements, because he was allegedly subjected to custodial interrogation and had not received *Miranda* warnings?

   b. Post-arrest statements, because he allegedly did not waive his *Miranda* rights, or, alternatively, because the police did not honor his decision to terminate questioning and remain silent?

2. Did the trial court abuse its discretion by refusing to suppress physical evidence seized at appellant's residence because the affidavit in support of the search warrant allegedly contained intentionally, knowingly or recklessly false statements which were necessary for a finding of probable cause?

3. Did the trial court properly refuse to allow the jury to determine whether appellant was on parole at the time of the instant offenses in enhancing punishment pursuant to A.R.S. § 13–604.-01(A)?

## FACTS

At approximately 6:00 p.m. on June 7, 1984, a robbery occurred at a Dairy Queen in Yuma, Arizona. A black male, with his hair styled in corn-row braids and wearing dark sunglasses entered the store. He asked the clerk, Jule Lute, who was 14 years old, for an ice cream cone. While her back was turned making the cone, he jumped over the serving counter, grabbed the clerk by her neck, and pointed a large Buck knife at her throat. The robber forced the clerk to empty the cash registers and place the money in a bank deposit bag. He also made her empty the contents of her purse, though he found nothing worth stealing there. He took the purse belonging to Anna Durazo, another Dairy Queen employee, which was hanging on the fire

extinguisher. After forcing the clerk to crouch down on the floor, he vaulted over the counter and escaped.

Officer Modesto of the Yuma Police Department arrived on the scene shortly after the robbery. He interviewed Jule Lute. She described the robber as a 5'11" black male who weighed approximately 160 pounds. According to Lute, the robber was wearing a baseball cap, a yellow pullover T-shirt, green shorts and tennis shoes. Modesto lifted fingerprints from the fire extinguisher that the robber had brushed while grabbing Anna Durazo's purse. The officer also obtained fingerprints from the metal serving counter over which appellant had jumped. In the middle of this same serving counter, Officer Modesto photographed a distinctive shoe print, which had a "running W" pattern on the sole and a "V" on the heel.

Anna Durazo was working at the time of the robbery. She was standing on the back parking lot talking to a friend, Armando Roman, who was in his pickup truck. Before the robbery, Durazo and Roman saw a black man approach and enter the store. Durazo recalled that this man was wearing his hair in corn-row braids.

Sergeant Ford, also of the Yuma Police Department, questioned Armando Roman about the robbery suspect. Roman indicated where the suspect walked in approaching the store. There, Sergeant Ford found footprints with the same distinctive design that was found on the serving counter inside the Dairy Queen. Later, the officer discovered a trail of these footprints leading from the store. Their pattern suggested that the person making them had been running. Sergeant Ford followed a trail of these footprints down an alley for several blocks to the porch of the house at 613 Avenue A. Appellant resided at this house with his girlfriend and her family.

Several officers from the Yuma Police Department arrived at the house. A man inside the house greeted the officers and invited them inside. Appellant, who was inside the house, generally matched the physical description of the robber, including the corn-row style of his hair. Appellant was also wearing tennis shoes with the same distinctive design on the sole found in the footprints at the scene of the crime and leading away from it. Otherwise, appellant's clothes did not match those worn by the robber. Officer Modesto asked appellant to accompany him to the police station to allow the police to obtain some physical evidence and general biographical information that would aid their investigation. Appellant complied with this request.

At the station, Officer Modesto took some photos of appellant. When he was asked why the police needed this information, the officer explained that appellant matched the description of a suspect in the armed robbery of a Dairy Queen. Appellant also asked whether he was under arrest. The officer replied "No."

In a showup held at the police station, neither Lute nor Durazo, the Dairy Queen employees present during the robbery, could identify appellant as the robber. Although they expressed uncertainty, they stated that they did not believe that he was the robber. They both conceded, however, that the corn-row styling of appellant's hair matched the hair style worn by the robber.

Officer Gross asked appellant if he could take his fingerprints. When appellant asked what would happen if he refused, the officer explained that the police would probably seek a court order. Appellant again inquired whether he was under arrest. The officer assured him that he had not been arrested. Appellant then allowed him to take his fingerprints. After doing so, Officer Gross asked if appellant had been present at the Dairy Queen earlier that day. "No, I haven't," appellant responded. Officer Gross did not ask appellant any other questions.

When the police learned that appellant's fingerprints matched those found at the crime scene, he was arrested. Appellant was interviewed by Officers Modesto and Campbell. Appellant acknowledged that he understood his rights and was willing to speak to the police. At first, appellant professed confusion about what was happening and why he was arrested. Officer Campbell explained the charges against

him and that his fingerprints had been found at the scene of the crime.

Appellant insisted that he knew nothing about the armed robbery at the Dairy Queen. In particular, he exclaimed that he "didn't threaten nobody with a knife." When he was informed that none of the officers had mentioned that a knife was used in the robbery, appellant denied referring to a knife in his earlier statement. Appellant also told the officers that although he had visited the Dairy Queen in question earlier in the day, he knew nothing about the crime.

Irma Harris, appellant's neighbor, was also interviewed by the police. She knew appellant personally. She saw appellant running across her back yard near the time of the crime. She recalled that appellant was dressed in shorts and tennis shoes, that his hair was in braids, and that he was carrying a brown purse under his arm. She saw him run into his back yard and go to the rear door of his house.

After obtaining a search warrant, the police searched appellant's residence. The bank bag and the money stolen were found under a chest of drawers in appellant's bedroom. Anna Durazo's driver's license, which had been in her purse, was found under the bed in the same room. The police also seized some long knives and some clothing, including some yellow T-shirts, shorts and sunglasses. Jule Lute was able to identify some of the clothing as that worn by the robber.

At trial, appellant raised an alibi defense. Delores Simon, the mother of appellant's girlfriend, testified for the defense. She claimed that appellant was at home during the time of the robbery.

## I. DID THE ADMISSION OF TWO OF APPELLANT'S STATEMENTS VIOLATE HIS *MIRANDA* RIGHTS?

(A) Was Appellant's Pre-arrest Statement Inadmissible Because He was Subject to Custodial Interrogation and Had Not Received *Miranda* Warnings?

■ In order to be admissible, statements obtained while an accused is subject to custodial interrogation require a prior waiver of *Miranda* rights. *See Miranda v. Arizona,* 384 U.S. 436, 478–79, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694, 726 (1966); *State v. Perea,* 142 Ariz. 352, 354, 690 P.2d 71, 73 (1984).

After taking appellant's fingerprints, Officer Gross asked him whether he had been present at the Dairy Queen earlier in the day. Appellant denied being at the scene of the crime that day. This statement was inconsistent with the story appellant later told police. Appellant had not yet received *Miranda* warnings. Appellant contends that this questioning occurred while he was "in custody." We disagree.

■ The objective test for "custodial" interrogation is whether under the totality of the circumstances a reasonable person would feel that he was in custody or otherwise deprived of his freedom of action in a significant way. *See Oregon v. Mathiason,* 429 U.S. 492, 494, 97 S.Ct. 711, 713, 50 L.Ed.2d 714, 719 (1977); *Rhode Island v. Innis,* 446 U.S. 291, 300, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297, 308 (1980); *Miranda v. Arizona, supra,* at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706; *State v. Burns,* 142 Ariz. 531, 534, 691 P.2d 297, 300 (1984); *State v. Perea, supra.*

■ In *Perea,* we declared that factors strongly indicative of custody include:

1) whether the objective indicia of arrest are present,

2) the site of the interrogation,

3) the length and form of the investigation, and

4) whether the investigation had focused on the accused.

142 Ariz. at 355, 690 P.2d at 74; *see also State v. Riffle,* 131 Ariz. 65, 67, 638 P.2d 732, 734 (App.1981).

■ As to the first factor, it did not objectively appear that appellant was under arrest. Several officers appeared at appellant's residence and were invited inside.

Officer Modesto asked appellant to accompany him to the station to take some photos and general information for their investigation. Appellant complied with this request. He was not handcuffed at any time. Guns were not drawn. Neither appellant nor his residence was searched at this time. *See State v. Perea, supra,* 142 Ariz. at 355, 690 P.2d at 74. Although appellant was not specifically informed that he was free to leave, he was twice told by the officers that he was not under arrest.

■ Next, we must consider the site of interrogation. It is true that the questioning of appellant at the police station is a factor that enhances the coercive nature of the interrogation. As we stated in *State v. Barnes,* 124 Ariz. 586, 606 P.2d 802 (1980), however, this circumstance does not require a finding of custody:

Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed because the questioning takes place at the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody." It was that sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited.

124 Ariz. at 589, 606 P.2d at 805 (1980) (quoting *Oregon v. Mathiason, supra,* at 495, 97 S.Ct. at 714, 50 L.Ed.2d at 719) (merely because suspect was questioned at police station does not alone show custodial interrogation); *see also State v. Perea, supra* (merely because the defendant was the last person seen with the victim and was interrogated at the police station does not prove custodial interrogation); *State v.*

*Garrison,* 120 Ariz. 255, 256–57, 585 P.2d 563, 564–65 (1978) (same holding as *Perea*).

■ It is true that Officer Gross indicated to appellant that the police would probably seek a court order if he refused to allow them to take his fingerprints. This statement was, however, immediately followed by an assurance that appellant was not under arrest. This statement also was not a legal misrepresentation and such a statement does not automatically establish custodial interrogation. *Cf. State v. Roscoe,* 145 Ariz. 212, 222, 700 P.2d 1312, 1322 (1984) (where accused was given *Miranda* warnings the day before, second interview did not rise to the level of custodial interrogation merely because the police accurately indicated that the accused's lawyer could not prevent the taking of physical evidence).

■ The length and form of this interrogation were not unduly coercive. Officer Gross asked appellant only one question. Appellant was present in the station for only approximately an hour before he received *Miranda* warnings. There were no threats or coercion of appellant. The police did not attempt to mislead appellant and they answered all his questions promptly and accurately.

The investigation had also not yet focused on appellant. The only evidence linking appellant to the crime was an uncertain chain of evidence. It was only after confirmation that appellant's fingerprints appeared at the scene of the crime that the police investigation focused upon appellant and he was arrested and given the full panoply of *Miranda* warnings.

■ Furthermore, admission of an accused's spontaneous, voluntary statement that is not made in response to police interrogation does not violate the defendant's *Miranda* rights. *See, e.g., Rhode Island v. Innis, supra,* at 301–02, 100 S.Ct. at 1689–90, 64 L.Ed.2d at 308; *State v. Burns, supra,* 142 Ariz. at 534, 691 P.2d at 300; *State v. Harding,* 137 Ariz. 278, 288, 670 P.2d 383, 393 (1983), *cert. denied,* — U.S.

at ——, 104 S.Ct. 1017, 79 L.Ed.2d 246 (1984). In the present case, appellant had already voluntarily revealed the information in question to another police officer.

■ Shortly after arriving at the police station, appellant asked Officer Modesto why the police needed information about him. The officer replied that appellant was a suspect in the armed robbery of a Dairy Queen that occurred earlier in the day. Appellant then exclaimed: "I didn't rob the Dairy Queen, I wasn't at the Dairy Queen, I will tell you what I did today at 3:00 p.m. ..." The officer interrupted appellant and stated that he preferred not to discuss the matter. This statement was plainly not in response to police questioning. Under the circumstances, the trial court acted within its discretion in refusing to suppress this statement.

(B) Were Appellant's Post-Arrest Statements Admitted in Violation of *Miranda v. Arizona?*

1. Did Appellant Waive His *Miranda* Rights?

■ After his arrest, appellant was interviewed by Officers Campbell and Modesto. Officer Modesto had the primary responsibility for interrogating appellant. Officer Campbell was responsible for filling out the booking forms so that appellant could be imprisoned. Appellant was asked by Officer Modesto whether he understood his rights. Both officers recall that appellant replied "Yeah." Appellant was also asked whether he would waive his rights and voluntarily speak to the police. Officer Modesto recalled that appellant answered this question affirmatively. Because Officer Campbell cannot specifically recall appellant's answer to this question, appellant argues that there was insufficient evidence to show that he waived his *Miranda* rights. The trial court rejected this contention. Both officers filled out police reports on the day of the interrogation which indicate that appellant validly waived his *Miranda* rights. The record therefore supports the trial court's determination that appellant waived his *Miranda* rights.

2. Did the Police Refuse to Honor Appellant's Decision to Terminate Questioning?

■ If a person is subjected to custodial interrogation and indicates a desire that interrogation cease or otherwise invokes his right to remain silent, this decision must be scrupulously honored by the police. *See Michigan v. Mosley,* 423 U.S. 96, 104, 96 S.Ct. 321, 326, 46 L.Ed.2d 313, 321 (1975); *Miranda v. Arizona, supra,* at 445, 473–74, 86 S.Ct. at 1612, 1627–28, 16 L.Ed.2d at 707, 723; *State v. Finehout,* 136 Ariz. 226, 229, 665 P.2d 570, 573 (1983); *State v. Sauve,* 112 Ariz. 576, 579, 544 P.2d 1091, 1094 (1976).

Appellant asserts that during his interview with Officers Modesto and Campbell he tried to terminate questioning, but the police refused to accept his decision. Appellant maintains, therefore, that admission at trial of his statement that he "didn't threaten nobody with a knife" was error. The trial court ruled that there was insufficient evidence of a constitutional violation. We agree.

It is true that Officer Campbell testified that initially appellant "didn't want to say anything." We believe, however, that appellant misinterprets this statement. When appellant was first questioned, he initially expressed confusion as to what was going on, what the charges were, and why he was arrested. According to the police, he acted like an innocent man who could not imagine why he had been accused of a crime. The officers explained more than once the charges against appellant and the evidence linking him to the crime. Appellant originally "didn't want to say anything" about the crime because he claimed not to know what the officers were talking about. Officer Campbell categorically stated that appellant never expressed a desire to terminate questioning or to deal with the police only through his attorney. Nor was appellant uncommunicative, because he vigorously protested his innocence. Certainly, appellant never indicated any unwillingness to speak to the police in

his earlier statements to Officers Gross and Modesto. In fact, his earlier spontaneous statement to Officer Modesto about not being present at the Dairy Queen earlier in the day indicated that appellant was anxious to exonerate himself.

It is also apparent from the record that Officer Campbell saw no inconsistency between saying that appellant initially "didn't want to say anything" and that appellant was quite willing to talk, but merely expressed mystification about why he was arrested. Both of these statements appear within a short space of one another in the transcript and both were elicited in response to nonleading questions.

Finally, Officer Campbell's account was fully corroborated by the police report he prepared on the day of interrogation and by the other officer present during questioning. No other evidence was presented to support the defense version of the facts. Under the circumstances, the trial court acted within its discretion in refusing to find that appellant's *Miranda* rights had been violated.

## II. WERE THERE INTENTIONAL, KNOWING OR RECKLESS MISSTATEMENTS IN THE AFFIDAVIT FOR THE SEARCH WARRANT WHICH INVALIDATE ANY FINDING OF PROBABLE CAUSE?

Appellant attacks the affidavit in support of the search warrant pursuant to which physical evidence was found at appellant's residence. This physical evidence included the bank bag and money taken, Anna Durazo's driver's license and some clothing identified as that worn by the robber during the robbery.

In *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the Supreme Court declared that a defendant may challenge the truthfulness of the factual statements in an affidavit supporting a warrant. The evidence seized by reason of a warrant will be deemed inadmissible if the defendant can show by a preponderance of the evidence that:

(a) The affiant made a false statement which was knowingly or intentionally false or which was made in reckless disregard for the truth;

(b) After the false statement is excised, the affidavit's remaining content is insufficient to support a finding of probable cause.

*Id.* at 171–72, 98 S.Ct. at 2684–85, 57 L.Ed.2d at 682.

Appellant asserts that there were three material facts which Detective Elkins, the affiant for the search warrant, either misstated or failed to disclose. Detective Elkins stated in his affidavit that (a) Jule Lute described the robber as having a "medium to muscular build." Detective Elkins also stated in his affidavit, apparently accurately, that appellant had a "stocky" build. Appellant asserts that adding "muscular" to this witness description was a material misstatement. We shall assume, *arguendo,* that Jule Lute never described the robber as "muscular." [1] Detective Elkins also stated in his affidavit that (b) appellant denied being present at the Dairy Queen earlier that day. Appellant complains that this statement is materially misleading because the detective failed to mention that appellant had also admitted being present at the Dairy Queen earlier in the day. Finally, the detective did not state that (c) the two Dairy Queen employees present during the crime, Lute and Durazo, participated in a showup held within two hours after the crime. According to appellant, these two witnesses stated that appellant was not the man who robbed them even though they expressed some uncertainty about their belief. Although there is

---

1. This is not entirely clear from the record. It is true that in her written statement Jule Lute describes the robber as having a "medium" build, and does not mention that he is "muscular." Neither Lute, nor Officer Modesto who interviewed her, were asked whether she might have mentioned this orally and simply failed to write it down. Because Officer Modesto reported to Detective Elkins after interviewing Lute, it is possible that this information could have been communicated to the detective.

a factual dispute as to whether the witnesses made this statement or merely stated that they were unsure whether appellant was the culprit,[2] we shall assume *arguendo* that appellant is right.

■ In order to show that the affiant acted with reckless disregard for the truth, we have required proof that the affiant entertained serious doubts about the truth of the affidavit. *See State v. Poland*, 132 Ariz. 269, 279, 645 P.2d 784, 794 (1982); *see also United States v. Davis*, 617 F.2d 677 (D.C.Cir.1979). Proof that the affiant entertained serious doubts concerning the affidavit's truth can be proven by obvious circumstances that impeach the credibility of the information in the affidavit. *Id.*

■ It appears that the evidence is inconclusive as to whether the detective intentionally, knowingly, or recklessly made erroneous statements in the affidavit. Merely innocent or negligent mistakes in an affidavit will not satisfy the first prong of the *Franks* test. *See Franks v. Delaware, supra,* at 171, 98 S.Ct. at 2684, 57 L.Ed.2d at 682. It is quite possible that the errors in the case at bar were only innocent or negligent mistakes. As to facts (a) and (b), it is undisputed that Detective Elkins had no firsthand knowledge of the true facts. The officers who were personally aware of the correct information could not recall whether this information was communicated to the detective. As to fact (c), Detective Elkins testified that he had been informed only that the victims of the crime were unsure in their identification of appellant, and not that they had positively stated that appellant was not the man. We need not decide, however, whether appellant has succeeded in establishing the first *Franks* requirement. It is plain that appellant has failed to establish the second *Franks* requirement of proving that but for these misstated facts there would not have been probable cause to support the search.

■ To determine whether the remaining content of the affidavit is sufficient to support a finding of probable cause, one must engage in the following analysis. The court must redraft the affidavit by deleting the falsehoods and adding the materially omitted facts. Then the court must determine if the remaining portions of the affidavit provide sufficient information to support a probable cause determination. *Franks v. Delaware, supra,* at 171–72, 98 S.Ct. at 2684–85, 57 L.Ed.2d at 682; *see State v. Martin*, 139 Ariz. 466, 473, 679 P.2d 489, 496 (1984).

Applying this method to the present case, we must exclude from the affidavit that (a) appellant was described by the victim as "muscular" as well as the statement that appellant is "stocky." We must add to the affidavit that (b) appellant told the officers after he was arrested that he had been at the Dairy Queen earlier on the day of the crime and that (c) the victims, although somewhat unsure about it, believed that appellant was not the robber.

The affidavit then reads as follows in pertinent part:

(1) a trail of distinctive footprints led from the scene of the crime to the residence searched, appellant's residence. Appellant was found inside this house wearing shoes with soles that matched this same distinctive pattern; (2) appellant generally matched the physical description given by the victims of the robbery; (3) appellant's fingerprints were found at the scene of the crime; (4) appellant initially stated twice that he had not been at Dairy Queen that day. Later, he stated that he had visited the store earlier in the day. This change in his story occurred after appellant was informed by the police that his fingerprints had been found at the scene of the crime; (5) appellant's neighbor, Irma Harris, knew him personally and could recognize him on sight. On the day of the crime,

---

**2.** In his police report, Officer Fell simply notes that Lute and Durazo "viewed Carter, and said he was not the man who robbed them." At trial, however, both testified somewhat differently. When asked about her response when

the police asked her whether she recognized appellant, Jule Lute said: "I told them I wasn't sure, that no, I don't think it's him." When Anna Durazo was asked this same question, she replied: "I told them I was not sure."

she saw appellant running across her back yard towards his house wearing the same type of clothing described by the robbery victims. Under his arm, he was carrying a brown purse. A brown purse was stolen from one of the victims in the robbery; (6) although unsure about it, the robbery victims believed that appellant was not the robber.

An officer has probable cause to conduct a search if a reasonably prudent person, based upon the facts known by the officer, would be justified in concluding that the items sought are connected with criminal activity and that they would be found at the place to be searched. *See State v. Summerlin*, 138 Ariz. 426, 431, 675 P.2d 686, 691 (1983); *United States v. Lucarz*, 430 F.2d 1051, 1055 (9th Cir.1970).

Plainly, even when the affidavit is redrafted to take account of the excluded facts, there is sufficient information to support a finding of probable cause. The most impressive information excluded was the robbery victims' belief, albeit somewhat uncertain, that appellant was not the robber. This fact is not, however, so probative as to preclude a finding of probable cause. Anna Durazo only casually glanced at the robber from a distance. When she saw the robber, he was not facing her and she saw him only by profile. Jule Lute did see the robber when he first entered the store. During the robbery, however, the assailant stayed behind her back and never allowed her to face him. She never saw the robber during the robbery, even while he was leaving. It is arguable that Irma Harris's identification of appellant as the robber was more reliable because she personally knew him. We find sufficient information for a probable cause determination.

A trial court's ruling on a motion to suppress will not be disturbed absent an abuse of discretion. *State v. Fischer*, 141 Ariz. 227, 236, 686 P.2d 750, 759, *cert. denied*, — U.S. —, 105 S.Ct. 549, 83 L.Ed.2d 436 (1984); *State v. Adamson*, 136 Ariz. 250, 253, 665 P.2d 972, 976, *cert. denied*, — U.S. —, 104 S.Ct. 204, 78 L.Ed.2d 178 (1983). There was no abuse of discretion.

III. THE TRIAL JUDGE'S DETERMINATION THAT THE ACCUSED WAS ON PAROLE AT THE TIME OF THE PRESENT CRIMES IN ENHANCING PUNISHMENT UNDER A.R.S. § 13–604.01(A).

Appellant asserts that the determination as to whether he was on parole for purposes of A.R.S. § 13–604.01(A) should have been made by the jury and not the trial judge. Appellant maintains that A.R.S. § 13–604(K) imposes this requirement. A.R.S. § 13–604(K) requires that if a previous conviction or the dangerous nature of a felony is alleged by the state, these allegations must either be admitted by the defendant or found by the trier of fact. *See* A.R.S. § 13–604(K); *State v. Turner*, 141 Ariz. 470, 475, 687 P.2d 1225, 1230 (1984). In *State v. Turner*, we answered appellant's precise contention in the following manner:

"A.R.S. § 13–604.01 does not contain language that requires a finding by the trier of fact that the defendant was on parole. That the crime was committed while the defendant was on parole is in the nature of an aggravating circumstance which enhances the possible penalty. When determining whether an aggravating circumstance exists, a trial judge 'may consider all evidence and information presented at all stages of the trial together with all probation and presentence reports and the testimony presented at the aggravation and mitigation hearing prior to sentencing. For sentencing purposes, the trial judge will have a much broader information base than was presented to the jury at trial. * * * It is only necessary that such a finding be true and that it be supported by reasonable evidence in the record.' "

*Id. Cf. State v. McNair*, 141 Ariz. 475, 485, 687 P.2d 1230, 1240 (1984) (it is not necessary that there be a jury determination as to whether the defendant was on probation

in enhancing punishment pursuant to A.R.S. § 13–604.01).

We continue to find this same rationale convincing. Appellant seeks, however, to distinguish *Turner* and *McNair*. In contrast to those cases, appellant did not admit that he was on parole or other release from confinement. Because the rationale for both of these cases was plainly not limited in this manner, we disagree.

Appellant also argues that because A.R.S. §§ 13–604 and 13–604.01 are statutes in *pari materia*, therefore the requirements of A.R.S. § 13–604(K) must apply to a finding that the accused is on parole, probation, or other release from confinement. This conclusion does not follow even if we assume *arguendo* that the premise is correct. A.R.S. § 13–604(K) imposes requirements for finding prior convictions and the dangerousness of offenses. As to these issues, A.R.S. §§ 13–604 and 13–604.01 have been found to be similar in many respects. *See State v. Caldera,* 141 Ariz. 634, 637, 688 P.2d 642, 645–46 (1984) (both A.R.S. §§ 13–604 and 13–604.01 require that the jury determine the issue of dangerousness); *cf. State v. Waggoner,* 144 Ariz. 237, 239, 697 P.2d 320, 322 (1985) (although an allegation of parole status need not be charged in the indictment or information under A.R.S. § 13–604.01, the timing requirements for this statute and A.R.S. § 13–604 are similar); *State v. Perkins,* 144 Ariz. 591, 595, 699 P.2d 364, 368 (1985) (A.R.S. § 13–604(H) limits sentences imposed by A.R.S. § 13–604.01); *but see State v. Villafuerte,* 142 Ariz. 323, 329, 690 P.2d 42, 48 (1984) (A.R.S. § 13–604(K) requirement that an allegation of dangerousness be charged in the indictment or information is not applicable to an allegation of dangerousness under A.R.S. § 13–604.01).

The *Turner* rationale is, however, that a finding as to probation, parole or other release from confinement is different from the predicates governed by A.R.S. § 13–604(K) because it is more akin to an aggravating circumstance. There is, therefore, every reason to believe that if such a finding were required by A.R.S. § 13–604, the legislature would delegate this responsibility to a trial judge, as it does with the finding of aggravating circumstances generally. *See, e.g.,* A.R.S. §§ 13–703(F), 13–702(D). Statutes are in *pari materia* only in the respects in which they can reasonably be expected to be similar. We reject appellant's argument.

We have reviewed the record for fundamental error. A.R.S. § 13–4035; *Anders v. California,* 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967); *State v. Leon,* 104 Ariz. 297, 451 P.2d 878 (1969). We have found none. Appellant's convictions and sentences are affirmed.

HOLOHAN, C.J., GORDON, V.C.J., and CAMERON and FELDMAN, JJ., concur.