NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

JAVIER ANGEL AGUAYO, *Appellant.*

No. 1 CA-CR 16-0736
1 CA-CR 16-0737
(Consolidated)
FILED 4-10-2018

Appeal from the Superior Court in Maricopa County
No. CR2012-115872-001
CR2013-428986-001
The Honorable Pamela S. Gates, Judge

**AFFIRMED AS MODIFIED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Terry M. Crist, III
*Counsel for Appellee*

Michael J. Dew Attorney at Law, Phoenix
By Michael J. Dew
*Counsel for Appellant*

**MEMORANDUM DECISION**

Presiding Judge Diane M. Johnsen delivered the decision of the Court, in which Judge Kent E. Cattani and Judge Jennifer M. Perkins joined.

J O H N S E N, Judge:

¶1        Javier Aguayo appeals his convictions and sentences for conspiracy to commit first-degree murder, attempted first-degree murder, aggravated assault and disorderly conduct. For the following reasons, we affirm the convictions and affirm the sentences as modified.

### FACTS AND PROCEDURAL BACKGROUND

¶2        P.D. was driving in Phoenix with T.F. and their young son one evening, when their vehicle inadvertently cut off an Acura Integra.[1] Decelerating quickly, the Acura darted behind P.D.'s vehicle, then swiftly pulled up on its left side. When P.D. and T.F. glanced to their left, they looked through the open car windows and clearly saw Aguayo in the driver's seat, with his right arm extended, pointing a black handgun in their direction. Fearing for their lives, P.D. immediately braked and called 9-1-1, providing the emergency operator a description of the driver and the Acura's license plate number. Less than an hour later, police officers detained Aguayo, and both victims identified him as the person who had pointed a gun at them.

¶3        Approximately four months later, Aguayo approached Ricco Monge and asked him to help with a home-invasion robbery. As initially presented to Monge, Aguayo planned to break into a home, restrain the owners, then ransack the home, with Monge serving as the get-away driver. During subsequent conversations, however, Aguayo revealed that he actually planned to kill the homeowner, T.F.

¶4        In the weeks leading up to the planned home invasion, Aguayo and Monge surveilled T.F. to learn her daily routine. At approximately 7:15 a.m. one morning, Aguayo, Monge, and Monge's roommate, Jeremie Villaverde, drove to T.F.'s house in Monge's Chevrolet

---

[1]      We view the facts in the light most favorable to sustaining the verdicts. *State v. Payne*, 233 Ariz. 484, 509, ¶ 93 (2013).

Cobalt. As the men pulled up, T.F. got into her car, preparing to drive to work. Monge and Villaverde waited in the Chevrolet while Aguayo walked toward T.F.'s car, firing five bullets. Although T.F. sustained numerous gunshot wounds, she drove away and called 9-1-1.

¶5 Later that afternoon, a detective interviewed T.F. at the hospital. Describing the shooter, T.F. explained that the man's face was mostly covered, but his complexion, height, weight and overall build resembled Aguayo, "that guy that . . . pulled a gun [on her] the first time." T.F. also stated that she could not think of anyone else who might want to harm her.

¶6 When the detective spoke with her again the following day, T.F. explained that she had described the silver revolver used in the shooting to P.D., which led P.D. to say his brother might have been the shooter. The detective asked T.F. if she could exclude P.D.'s brother as a suspect based on the shooter's physical appearance, and T.F. responded that P.D.'s brother and the shooter shared a similar build. Nonetheless, as the interview continued, T.F. repeatedly reaffirmed her belief that the shooter looked like Aguayo.

¶7 During the ensuing investigation, detectives obtained a warrant to attach a GPS tracking device to Aguayo's Acura. Later, they obtained warrants for Aguayo's home, electronics, vehicle and telephone records. Through these warrants, detectives (1) learned that Aguayo had driven by T.F.'s residence after the shooting, (2) seized a store receipt for Remington .357 Magnum shells from the Acura that an expert later determined were consistent with bullet fragments recovered from the shooting, (3) retrieved text messages from Aguayo's cell phone discussing Monge's payment for his role as the get-away driver, and (4) obtained cell tower data demonstrating that Aguayo's, Monge's, and Villaverde's phones each accessed the tower closest to T.F.'s house near the time of the shooting.

¶8 The State charged Aguayo with one count of attempted first-degree murder and three counts of aggravated assault (identifying T.F. as the victim of the shooting and she and P.D. as victims in the road incident). By separate indictment, the State also charged Aguayo with one count of conspiracy to commit murder and further alleged multiple aggravating circumstances. The superior court consolidated the charges for trial.

¶9 After a 28-day trial, a jury found Aguayo guilty of attempted first-degree murder (renumbered Count 3), conspiracy to commit first-degree murder (renumbered Count 5), aggravated assault against P.D.

(renumbered Count 2), and the lesser-included offense of disorderly conduct against T.F. (renumbered Count 1 – in the road incident). The jurors were unable to reach a verdict on the other charge. After the jury found multiple aggravating factors, the court sentenced Aguayo to a presumptive term of 2.25 years' imprisonment on Count 1; a concurrent, presumptive term of 7.5 years' imprisonment on Count 2; a consecutive term of 25 years' imprisonment on Count 3; and a consecutive term of life without the possibility of parole for 25 years on Count 5.[2] Aguayo timely appealed, and we have jurisdiction pursuant to Arizona Revised Statutes ("A.R.S.") sections 12-120.21(A)(1) (2018), 13-4031 (2018), and -4033(A)(1) (2018).[3]

## DISCUSSION

### A.    Validity of Warrant Affidavits.

¶10        Aguayo contends that the affidavits supporting the search warrants for his vehicle, home and cellular phone records omitted material facts in violation of *Franks v. Delaware*, 438 U.S. 154 (1978).

¶11        Early in the prosecution, Aguayo requested a *Franks* hearing and moved to suppress the evidence obtained from the GPS tracking device placed on his vehicle. To support his requests, Aguayo identified the following facts, recounted in police reports and interviews but omitted from the warrant affidavit, that he claimed would have altered the judicial officer's probable cause analysis if they been disclosed in the warrant affidavit: (1) T.F.'s statement that P.D. suspected his brother was the shooter, (2) eyewitnesses' contradictory descriptions of the shooter, (3) Villaverde's criminal history and admitted drug use, and (4) Villaverde's exculpatory statements regarding Aguayo.

¶12        The superior court denied Aguayo's request for an evidentiary hearing and his motion to suppress, finding the affidavit

---

[2]        Under the relevant statute, the sentence on the conspiracy conviction, Count 5, is stated as "life imprisonment without possibility of release on any basis until the service of twenty-five calendar," Ariz. Rev. Stat. ("A.R.S.") § 13-1003(D) (2018), and we modify the judgment accordingly. *See* A.R.S. § 13-4037(A) (2018) (authorizing an appellate court to "correct" an illegal sentence); Ariz. R. Crim. P. 31.19(d) (authorizing court to modify a judgment).

[3]        Absent a material revision of a statute or rule of procedure since the relevant date, we cite the current version.

submitted in support of the warrant did not contain "any false statements made knowingly, intentionally or with reckless disregard for the truth." The court noted, however, that the affidavit "may have failed to convey accurately some equivocal statements made by [T.F.] regarding the identification of the shooter." The court also rejected Aguayo's contention that the other eyewitnesses' descriptions of the shooter were inconsistent with the affidavit and further found that the limited "information regarding Mr. Villaverde" did not render the affidavit "false, incomplete, or misleading."

¶13        Aguayo then filed another request for a *Franks* hearing and moved to suppress all evidence seized pursuant to the search warrants executed on his home and vehicle, as well as the cellular phone records that investigating officers obtained pursuant to a warrant. The superior court held a five-day evidentiary hearing on these motions, and after considering the evidence presented – including testimony from the investigating detectives – the court ruled the search warrants were valid.[4] The court found that the affidavits did not contain any false statements made knowingly, intentionally or with reckless disregard for the truth, although it again acknowledged that the affidavits "failed to convey accurately some equivocal statements" T.F. made regarding the shooter. The court further noted that even without T.F.'s statement that she was "sure" Aguayo was the shooter, the "remaining content" in the affidavits was "sufficient to establish probable cause." With respect to Aguayo's other contentions, the court found that neither the summation of the other eyewitnesses' accounts nor the omission of certain information regarding Villaverde rendered the affidavits false, incomplete or misleading. Accordingly, the court denied Aguayo's motions to suppress.

¶14        Under *Franks*, "a defendant may challenge the truthfulness of the factual statements in an affidavit supporting a warrant," *State v. Carter*, 145 Ariz. 101, 108 (1985), and may contest any "deliberate or reckless omissions of facts that tend to mislead," *Frimmel v. Sanders*, 236 Ariz. 232, 239, ¶ 27 (2014) (quotation omitted). The superior court must suppress evidence seized pursuant to a warrant if the defendant proves, by a preponderance of the evidence, that (1) the affiant intentionally, knowingly, or with reckless disregard for the truth omitted material information, and

---

[4]        Although the court's minute entry rulings expressly denied Aguayo's requests for a *Franks* hearing, and Aguayo argues error on that basis, the record clearly reflects that the court held a lengthy evidentiary hearing on the motions, which provided Aguayo a full opportunity to explore the alleged omissions.

(2) the omitted material information, if included, would have rendered the affidavit insufficient to support a finding of probable cause. *See State v. Poland*, 132 Ariz. 269, 279 (1982).

¶15        On appeal, our review is limited to the evidence the superior court considered at the suppression hearing, and we view the facts in the light most favorable to sustaining the court's ruling. *State v. Hausner*, 230 Ariz. 60, 70, ¶ 23 (2012). We uphold the court's finding "on whether the affiant deliberately . . . excluded material facts" unless it is clearly erroneous. *State v. Buccini*, 167 Ariz. 550, 554 (1991). We review *de novo*, however, a superior court's finding "whether a redrafted search warrant affidavit is sufficient to establish probable cause." *Id*. at 555.

¶16        "[I]nnocent or negligent" errors in an affidavit do not satisfy the first prong of the *Franks* test; instead, the defendant must prove that the affiant did not believe the avowals or at least entertained serious doubts about their truth. *Carter*, 145 Ariz. at 109. Such doubts may "be shown by actual deliberation" or "by obvious reasons to doubt" the veracity or accuracy of the information relied upon. *Poland*, 132 Ariz. at 279 (quotation omitted).

¶17        Although not identical, the underlying affidavits relied on to establish probable cause for the search warrants set forth substantially similar information regarding T.F.'s description and identification of the shooter, the other eyewitnesses' descriptions of the shooter, and Villaverde's involvement in the case. T.F. described the shooter as a male wearing a red and blue plaid jacket, jeans, a gray hoodie pulled over his head and a dark blue beanie pulled over his mouth and nose. Based on the shooter's body type, body shape and skin tone, T.F. positively identified Aguayo as the shooter; she was certain the shooter was the same man who had previously pointed a gun at her. Other witnesses generally described the shooter as a slender Hispanic man in his 20's, between 5'6" to 6'0" tall, wearing a hooded sweatshirt and a ski mask, running or walking with a limp. Meanwhile, a detective observed Villaverde as he met with Aguayo in a parking lot, and said he drove a vehicle that matched the eyewitnesses' description of the getaway car, and the men appeared to examine and remove something from inside the trunk of Villaverde's car. A short time later, when Villaverde was pulled over for traffic violations, he admitted possessing illegal drugs in his trunk and also acknowledged selling illegal drugs.

¶18        At the evidentiary hearing, the affiant detective testified that she interviewed Villaverde at length and acknowledged that she did not

incorporate many of his statements in the affidavits, such as his contentions that he had never seen Aguayo act violently or possess a gun. She explained, however, that she is trained to provide a short and succinct probable cause statement, and therefore, as a matter of course, includes only "enough information to show that there [was] probable cause." When pressed on that point, the detective avowed that, in this case, she included all relevant and pertinent information that she believed would be helpful to the judicial officer charged with assessing probable cause.

¶19        Because the superior court is in a "unique position to judge" an affiant's credibility, we defer to its finding as to whether the affiant knew material facts had been omitted from the affidavit. *See Buccini*, 167 Ariz. at 555. Here, the investigating detective's testimony supported the superior court's conclusion that the detective did not intend to mislead the judicial officer. *See Carter*, 145 Ariz. at 109. Thus, to the extent there arguably were material omissions, the record supports a finding that they were only innocent or negligent mistakes. *See id.* Accordingly, the superior court did not err in finding that the affiant detective was not recklessly, knowingly or intentionally deceitful by failing to include the challenged information in the affidavits.

¶20        Moreover, if redrafted to include the excluded facts, the affidavits would have provided sufficient information to support a finding of probable cause. Incorporating the challenged omitted facts, the affidavits would have informed the judicial officer that: (1) T.F. believed she recognized Aguayo as the shooter, (2) P.D. believed his brother may have been the shooter based on T.F.'s description of the handgun, (3) other eyewitnesses uniformly described the shooter as a young, slender male whose face and body was mostly covered, but inconsistently reported his height, providing a range between 5'6" to 6' tall, and race (some reported the shooter was Hispanic and at least one reported the shooter was white), (4) Aguayo met with Villaverde, who drove a vehicle similar in appearance to the getaway car described by eyewitnesses, (5) Aguayo associated with Monge, who owned a .357 revolver handgun matching T.F.'s description of the shooter's weapon, (6) Villaverde was involved in criminal drug activity, and (7) Villaverde claimed he never saw Aguayo act violently or possess a gun.

¶21        Contrary to Aguayo's argument, P.D.'s suspicion that his brother might have been the shooter because he owned a silver handgun did not undermine T.F.'s repeated avowals that she recognized Aguayo as the shooter. Although T.F. arguably equivocated on her identification of the shooter during her second interview by mentioning P.D.'s suspicion

and noting that P.D.'s brother and the shooter had a similar build, when pressed by the detective, T.F. reaffirmed her identification of Aguayo, stating he and not P.D.'s brother was the shooter. Therefore, viewed in context, P.D.'s suspicion did not preclude a finding of probable cause.

**¶22**      Furthermore, the affidavits' composite of the eyewitnesses' descriptions was not false or misleading; explaining that there were some discrepancies in the eyewitnesses' accounts would not have defeated a finding of probable cause. And, to the extent Aguayo argues Villaverde's criminal activity and drug use were relevant, the affidavits clearly detailed that Villaverde admitted transporting and selling illegal drugs, thereby providing the judicial officer a meaningful opportunity to evaluate his veracity. *Cf. Frimmel*, 236 Ariz. at 240, ¶¶ 33-34 (affiant's failure to provide background information regarding informants deprived magistrate "of the opportunity to meaningfully and neutrally evaluate the veracity of the informants"). Given his admitted criminal activity and suspected involvement in the shooting, there is no basis to conclude that Villaverde's exculpatory statements regarding Aguayo would have changed the judicial officer's probable cause determination. Therefore, read in their entirety and including the omitted facts, the affidavits provided sufficient information to support a finding of probable cause, and the superior court did not err in holding the search warrants were valid.

## B.      Denial of Motions to Suppress.

**¶23**      The federal and state constitutions protect individuals against unreasonable searches and seizures, U.S. Const. amend. IV; Ariz. Const. art. 2, § 8, and "any evidence collected in violation" of these provisions "is generally inadmissible in a subsequent criminal trial." *State v. Valenzuela*, 239 Ariz. 299, 302, ¶ 10 (2016); *see State v. Peoples*, 240 Ariz. 244, 247, ¶ 9 (2016) ("A warrantless search is per se unreasonable . . . unless an exception to the warrant requirement applies.").

**¶24**      We review the denial of a motion to suppress evidence for an abuse of discretion. *Brown v. McClennen*, 239 Ariz. 521, 524, ¶ 10 (2016). In doing so, we defer to the superior court's determination of officers' credibility, *State v. Mendoza-Ruiz*, 225 Ariz. 473, 475, ¶ 6 (App. 2010), and uphold the court's ruling if it is legally correct for any reason. *State v. Huez*, 240 Ariz. 406, 412, ¶ 19 (App. 2016).

### 1.    Cell phone evidence.

¶25        Aguayo contends the superior court improperly denied his motion to suppress evidence from the cell phones seized from his home. He argues police officers who executed an initial search warrant on his home unlawfully searched the cell phones they found there by accessing them before they obtained a second search warrant that specifically included electronics. *See Peoples*, 240 Ariz. at 249, ¶ 15 (holding cell phones "are intrinsically private," and therefore cell phone owners have a "legitimate expectation of privacy" that their phones will be protected from unlawful search and seizure). In a series of motions to suppress, Aguayo moved to suppress evidence obtained from two cell phones seized from his home. Citing police records, Aguayo argued the phones were manipulated twenty minutes before a judicial officer issued the electronics warrant, reasoning the cell phones therefore were seized unlawfully.

¶26        Officers executed a warrant on Aguayo's home that authorized the search and seizure of Aguayo, a buccal swab from Aguayo, all firearms, all ammunition, and any biological evidence. While conducting an initial sweep of the property, a sergeant noticed two cell phones in Aguayo's bedroom on a desk in plain view. He then contacted the investigating detective and asked her to draft a second affidavit for a search warrant on the residence that included electronics. The resulting electronics warrant identified the phone carrier and described the cell phones to be seized.

¶27        At the evidentiary hearing on the motion to suppress, the officers who executed the warrants on Aguayo's home avowed that no one touched or otherwise manipulated the cell phones before the electronics warrant issued. However, when defense counsel asked a sergeant how the officers had determined which carrier serviced the cell phones, as noted in the electronics warrant, the sergeant answered that he did not "remember" how that information was obtained. Nonetheless, he testified that, as a matter of routine protocol, officers do not turn on electronic devices before they are seized pursuant to a warrant. At that point, defense counsel pressed further, asserting "something had to be done physically" to the cell phones to ascertain the identifying information set forth in the affidavit. In response, the sergeant replied, "[I]t's extremely possible, yes." When defense counsel suggested that someone may have turned the phone "around," the sergeant agreed, "That's probabl[e]." When prompted on redirect, however, the sergeant recalled that Villaverde had disclosed Aguayo's cell phone number to police officers before the first search warrant was executed, as noted in the initial affidavit, and officers were able

to use that information to determine the service provider listed on the warrant without manipulating the phone. Accordingly, the sergeant reaffirmed that the officers seized the cell phones only after the electronics warrant had issued, not before.

¶28 In denying the motion to suppress, the superior court specifically found the sergeant's testimony credible and concluded there was "no evidence" that law enforcement officers searched or seized the phones before the electronics warrant issued. Accordingly, the court determined the cell phone evidence was lawfully seized, and denied the motion to suppress.

¶29 The record supports the court's findings. Although the sergeant equivocated on cross-examination when asked whether officers may have manipulated the cell phones to obtain service-provider information, he clarified his testimony on redirect and explained that it would not have been necessary to access the phones because Villaverde already had disclosed Aguayo's cell phone number, which by itself would have been sufficient to determine the phone's service provider.

¶30 To the extent Aguayo argues the police records show that the cell phones were seized 20 minutes before the electronics warrant issued, we note that the cited police reports state that the phones were "located" and "found" at 1:25 p.m. Without question, these items were *found* before the affiant drafted the second affidavit and the judicial officer issued the corresponding electronics warrant at 1:45 p.m., but the police records do not reflect that the phones were *searched* or *seized* before the electronics warrant issued. Therefore, the superior court did not abuse its discretion by denying the motion to suppress the cell phone evidence.

### 2. Vehicle evidence.

¶31 Aguayo contends the superior court improperly denied his motion to suppress all evidence seized from his car. Because a police officer impounded the Acura five days before a search warrant issued, Aguayo argues his car was unlawfully seized and therefore any subsequent search was likewise illegal.

¶32 At the evidentiary hearing, an investigating detective explained that police officers tracked Aguayo's Acura to a repair shop, where the car was inoperable. Because the shop was not secure, officers decided to seize the vehicle before obtaining a warrant. Consistent with the detective's testimony, the officer who ordered the Acura towed to a police crime lab explained he did so without a warrant because he was concerned

evidence might be tampered with or destroyed. And the officer avowed that police did not open the Acura until a vehicle search warrant issued five days later.

**¶33** After taking the matter under advisement, the superior court denied the motion to suppress, finding the warrantless seizure was not unlawful. Noting law enforcement officers may seize a car from a public place without a warrant when they have probable cause to believe that the vehicle contains evidence of a crime, the court found Aguayo "had the same or lesser expectation of privacy" in his vehicle when it was housed at a repair shop than if it had "been parked in a public street because a repair person would presumably have access to the interior of the vehicle, the engine, and the trunk."

**¶34** Under the automobile exception to the warrant requirement, law enforcement officials acting with probable cause do not need a warrant to seize a readily mobile vehicle parked in a street, parking lot or other open space because such a seizure does "not involve any invasion of privacy." *Florida v. White*, 526 U.S. 559, 566 (1999) (quotation omitted). Although this exception recognizes the "impracticability of securing a warrant to search a vehicle that could be quickly moved," it is "also justified by a lessened expectation of privacy with respect to vehicles." *State v. Reyna*, 205 Ariz. 374, 375, ¶ 5 (App. 2003); *see also California v. Carney*, 471 U.S. 386, 391 (1985) ("Besides the element of mobility, less rigorous warrant requirements govern because the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office.") (quotation omitted). As such, "the justification to conduct . . . a warrantless search does not vanish once [a] car has been immobilized; nor does it depend upon a reviewing court's assessment of the likelihood . . . that the car would have been driven away, or that its contents would have been tampered with, during the period required for the police to obtain a warrant." *Michigan v. Thomas*, 458 U.S. 259, 261 (1982); *see also Reyna*, 205 Ariz. at 378, ¶ 15 ("exigent circumstances are not needed to authorize a warrantless search" under the automobile exception "when probable cause exists to believe the vehicle contains contraband").

**¶35** Consistent with the superior court's findings, the record reflects that Aguayo's privacy interest in the Acura was lessened by the vehicle's location in a commercial facility. Indeed, Aguayo does not dispute that repair shop employees could access the interior of his car. Although the Acura was temporarily inoperable, a mechanic told police the car's malfunction had been diagnosed, and therefore it was unclear how long the vehicle would remain immobile. *See United States v. Mercado*, 307 F.3d 1226,

1229 (10th Cir. 2002) ("temporary immobility due to a readily repairable problem while at an open public repair shop does not remove [a] vehicle from the category of 'readily mobile'").  Given these circumstances and the officers' probable cause to believe that the Acura contained evidence of a crime, the automobile exception authorized the vehicle's seizure.

**CONCLUSION**

**¶36**        As stated, *see* note 2, *supra*, we modify the sentence imposed on Count 5, conspiracy to commit first-degree murder, to "life imprisonment without possibility of release on any basis until the service of twenty-five calendar." *See* A.R.S. § 13-1003(D).  Otherwise, for the foregoing reasons, we affirm the convictions and affirm the sentences as modified.

