772 P.2d 1121

**STATE of Arizona, Appellee,**

v.

**Larry Joseph PRINCE, Appellant.**

**No. CR–86–0162–AP.**

Supreme Court of Arizona,
En Banc.

April 6, 1989.

Robert K. Corbin, Atty. Gen., by William J. Schafer III, Diane M. Ramsey, Asst. Attys. Gen., Phoenix, for appellee.

Patterson & Seplow by Philip A. Seplow, Phoenix, for appellant.

MOELLER, Justice.

## JURISDICTION

Defendant Larry Joseph Prince was convicted of first degree murder and sentenced to death. He appeals both the conviction and the sentence. This court has jurisdiction pursuant to A.R.S. § 13–4031 and article VI, § 5(3) of the Arizona Constitution.

## FACTS

Defendant used and sold cocaine supplied by the victim, Robert Richards. Generally, Richards would advance defendant a quantity of cocaine, defendant would "cut it," sell it, and then pay Richards. The evidence clearly demonstrates the defendant killed the victim; his reason for doing so is less clear.

On Monday, October 8, 1984, defendant was arrested on an assault charge. At the time of his arrest, he owed Richards money for past cocaine transactions. He was released from jail on Thursday, October 11, 1984. That evening he celebrated his release at the apartment he shared with his girlfriend, Tammy Shaw. Also living at the apartment were Kevin Cobey, a co-defendant who ultimately pled guilty to burglary and testified for the state, and Cobey's girlfriend, Julie Swan.

On Friday, October 12, 1984, the day Richards was murdered, defendant and Cobey went to Tom Ellinghausen's apartment. Cobey previously lived with Ellinghausen until Ellinghausen demanded he move out because of Cobey's involvement with cocaine. Ellinghausen testified that Cobey and defendant arrived at his apartment between 7:00 and 8:00 p.m. Cobey testified that defendant had a gun with him at Ellinghausen's apartment—a KG–99. Other witnesses confirmed that defendant often carried a KG–99.

At Ellinghausen's apartment, Cobey, defendant, and Ellinghausen watched a sporting event on television. From the apartment, defendant telephoned the victim, Richards. Richards telephoned defendant back and they made plans for Richards to meet defendant in the parking lot outside Ellinghausen's apartment. Cobey testified that after defendant's conversation with Richards, defendant told Cobey that "he was pissed off," that "Rob didn't have his stuff or something," and that "he was going to shoot him."

During the telephone conversation, Richards was at a house belonging to James Tabola. In return for cocaine, Tabola permitted Richards to use a closet in his house to store cocaine and prepare it for sale. Richards arrived at Tabola's house at approximately 7:30 p.m. After the telephone conversation, Richards asked Tabola for a baggy and some flour. Richards told Tabola that he planned to sell the flour as cocaine and thereby recover $1100 owed to him by the person with whom he had just spoken. Richards then told Tabola he was going to meet a person who had just been released from jail for assault a few days before and who owed him $1100.[1]

Shortly after this phone conversation, the defendant, carrying the KG–99 gun wrapped in a towel, left Ellinghausen's apartment to meet Richards in the parking lot. By this time, Ellinghausen had gone into the bathroom to get ready to go out for the evening; he closed the door and had the fan and water running. Cobey was still in the main area of the apartment. Cobey testified that he heard a car pull up in front of the apartments and then heard a shot. Cobey pulled back the curtain and saw Richards's car pull away.

Shortly after Cobey saw the car pull away, defendant telephoned Ellinghausen's

1. The defendant's testimony was that he owed Richards $1250, which he claimed to have paid him the night of the murder. Richards's notebook also referred to "1250."

apartment and spoke to Cobey. Cobey, in turn, told Ellinghausen that they needed to pick defendant up at a nearby Jack-in-the-Box. When Cobey and Ellinghausen met defendant at the Jack-in-the-Box, he was not wearing a shirt and did not have the gun with him. He was, however, carrying some of Richards's jewelry. The three men then stopped at a Circle K, bought a six-pack of beer, and returned to Ellinghausen's apartment.

Later, defendant and Cobey went to Richards's apartment, entering it with the keys the defendant had taken from Richards's car. Inside, they searched Richards's apartment for cocaine, money, and jewelry. Finding only jewelry, they took it, left Richards's keys on the kitchen counter, and went to the apartment they shared with Tammy Shaw and Julie Swan. There, later that evening, defendant admitted the murder to Cobey, describing how he had shot Richards in the face, rolled him over to the passenger side of the car, and driven away. When Cobey inquired of defendant about the cartridge from the bullet, defendant responded that he would "take care of it."

Cobey subsequently told Ken Hatch, a mutual friend of Cobey and defendant, about the murder. Later the same day, Hatch confronted defendant about it. Initially, defendant denied any involvement to Hatch, but later that night admitted the murder to him. Defendant eventually told Hatch details involved in the murder, including shooting Richards in the mouth, removing Richards from the driver's seat, and then driving to the location where the body was found and walking away.

On Sunday morning, October 14, Daniel McCling found Richards's body and called the police. On the night of the murder, McCling had seen brake lights from a car through his window. He went to the window, looked out, and saw an unidentified white male (the defendant is white) get out of the car and walk away. Although he was unsure of the time, McCling thought this occurred at approximately 10:00 p.m.

## ISSUES PRESENTED

1. Whether defendant is entitled to a reversal because a judge pro tem presided at his trial.

2. Whether the trial court erred by not suppressing defendant's statements.

3. Whether the trial court erred by not suppressing evidence seized pursuant to a search warrant.

4. Whether defendant is entitled to a reversal because of evidentiary rulings of the trial court.

5. Whether the verdict is contrary to the weight of the evidence.

6. Whether the trial court abused its discretion by denying a new trial based on alleged juror misconduct.

7. Whether the trial court properly imposed the death penalty.

## JUDGE PRO TEM

■ A full-time court commissioner sitting as a judge pro tem presided over defendant's trial. Defendant contends for the first time on appeal that he has an absolute right to be tried by a permanent merit selection judge. Defendant waived this argument by failing to raise it at trial. *See State v. Mincey*, 141 Ariz. 425, 687 P.2d 1180 (1984). In any event, his argument is without merit. *State v. White*, 160 Ariz. 24, 32, 770 P.2d 328, 336 (1989).

■ We note, however, that whenever possible, the original trial judge should hear post-conviction relief proceedings. Ariz.R.Crim.P. 32.4(c); *see also State v. Gerlaugh*, 144 Ariz. 449, 698 P.2d 694 (1985). Judges pro tem are less likely to be available to hear post-conviction matters than permanent judges. As a matter of judicial economy and to promote the purposes that led us to adopt Rule 32.4(c), we suggest that, when possible, cases involving potential death sentences or even lengthy prison sentences be assigned to permanent judges.

## DEFENDANT'S STATEMENTS

■ Defendant acknowledges that he was informed of his *Miranda* rights and responded affirmatively when asked if he understood those rights. Because no offi-

cer specifically asked defendant if he waived his rights, he contends the trial court erroneously admitted his statements. We will uphold the trial court's ruling on waiver issues absent clear and manifest error. *State v. Cruz–Mata,* 138 Ariz. 370, 373, 674 P.2d 1368, 1371 (1983).

By responding to questions defendant had just indicated he understood he was not required to answer, the trial court could conclude that defendant knowingly, intelligently, and voluntarily waived his right to remain silent. It is not necessary for any particular procedure or ceremony to take place; the defendant need not proclaim: "I waive my *Miranda* rights." So long as it is apparent from the totality of the circumstances that defendant understands his rights and nevertheless chooses to answer questions, we will affirm a finding of waiver. *See State v. Hein,* 138 Ariz. 360, 674 P.2d 1358 (1983).

■ Defendant also contends that the interrogating officer ignored his "request" for an attorney and, therefore, the court should have suppressed his statements after the "request." At the hearing on the motion to suppress, defendant said he asked the officer: "Do you think I should get a lawyer?" and the officer responded: "That's up to you." The officer recalls no such exchange. However, assuming it occurred, it does not constitute an invocation of right to counsel. *See State v. Linden,* 136 Ariz. 129, 134, 664 P.2d 673, 678 (App. 1983) (*citing United States v. Bettenhausen,* 499 F.2d 1223, 1231 (10th Cir.1974) ("The record shows that the defendant clearly understood his right to counsel and did not make a specific request for assistance of counsel.")). We hold that the trial court properly admitted defendant's statements.

## SEARCH WARRANT

Defendant questions the legality of the search warrants used to seize evidence from his two residences [2] and contends the court should have suppressed the resulting evidence, which included an empty box for a KG–99 nine millimeter pistol. We will not reverse a trial court's ruling on a motion to suppress absent an abuse of discretion. *State v. Carter,* 145 Ariz. 101, 110, 700 P.2d 488, 497 (1985); *State v. Fischer,* 141 Ariz. 227, 236, 686 P.2d 750, 759, *cert. denied,* 469 U.S. 1066, 105 S.Ct. 548, 83 L.Ed.2d 436 (1984).

Defendant attacks the warrants on two grounds. First, he contends that the supporting affidavits do not establish probable cause that the property sought was located on the premises to be searched. Second, he contends the warrants are so broad as to constitute general warrants. We reject both arguments.

■ A warrant is supported by probable cause if the supporting affidavit contains facts from which a reasonably prudent person could conclude that the items sought are related to criminal activity and are likely to be found at the place described. *Carter,* 145 Ariz. at 110, 700 P.2d at 497; *see also State v. Summerlin,* 138 Ariz. 426, 431, 675 P.2d 686, 691 (1983). The affidavits in this case supply the necessary probable cause.

The autopsy report indicated the victim was shot with a nine millimeter weapon. The affidavit indicated that defendant owned a KG–99 weapon, which is a nine millimeter weapon, and a Colt .380 handgun. In addition, the affidavit indicated that defendant was with the victim on the night he was killed and that defendant's fingerprints were found inside the victim's car. These facts support the inference that the murder weapon could likely be found at one of the two residences.

■ Defendant's second attack on the validity of the search warrants is that they were overly broad because they authorized the seizure of "[a]ny other evidence that would tend to indicate that Larry Joe

2. Defendant resided at two locations. During the week he generally lived with his girlfriend at the Shaw–Swan apartment. This location was the subject of the first search warrant. On weekends, he often stayed with his brother, James Prince. This location was the subject of the second search warrant. The warrants and affidavits were identical in all respects except for the address to be searched.

Prince, W/M, 8–4–63 did commit the crime of murder." If the above language was the only language in the warrants, the warrants would not pass constitutional muster. *State v. Moorman,* 154 Ariz. 578, 583, 744 P.2d 679, 684 (1987). However, the warrants first properly authorized a search for two weapons. Then the warrants merely state a correct proposition of law: while legitimately searching for specified items, police may seize any other items likely connected to the crime, although not specifically listed in the warrant. *Id.; see also State v. Adamson,* 136 Ariz. 250, 259, 665 P.2d 972, 981, *cert. denied,* 464 U.S. 865, 104 S.Ct. 204, 78 L.Ed.2d 178 (1983); *State v. Scigliano,* 120 Ariz. 6, 9, 583 P.2d 893, 896 (1978). Thus, we find no error.

### EVIDENTIARY RULINGS

Defendant advances several claims of error based on evidentiary rulings made by the trial court. We discuss each briefly. None requires reversal.

■ Defense counsel attempted to impeach a state witness by asking him whether he had ever pointed a gun at his wife. The court sustained the state's objection. Specific instances of conduct of a witness may only be inquired into on cross-examination if they are probative of truthfulness or untruthfulness. Ariz.R.Evid. 608(b). This line of inquiry was not probative of the witness's veracity; thus, the trial court correctly sustained the objection.

■ Defendant complains that a state witness offered opinion testimony that another state witness, Hatch, was an honest person. Had defendant objected when the state asked the question, the court might well have sustained the objection under Rule 608(a) of the Arizona Rules of Evidence, which only permits evidence of a witness's truthful character after that witness's reputation for truthfulness has been attacked. However, defense counsel elected not to object but, instead, immediately brought out the fact that the witness had two shoplifting convictions. Defendant waived the objection; there is no error.

■ Defendant next claims he should have been permitted to ask state witness Larry Rosky if Hatch had ever beaten his (Hatch's) wife. Defendant's theory was that Rosky, in a pre-trial interview, denied to defense counsel that Hatch beat his wife; defense counsel, however, claimed to have evidence that Rosky intervened in a Hatch wife-beating a few years earlier. Thus, defense counsel argues, because Rosky lied about this event in a pre-trial interview, the evidence was probative of Rosky's character for untruthfulness. Although defense counsel purported to introduce this evidence to demonstrate Rosky's lack of veracity, we perceive this line of inquiry as an attempt by defense counsel to impeach Hatch in a manner already rejected by the trial court. Therefore, the trial court properly sustained the state's objection.

Even if defense counsel was earnest in his method of impeaching Rosky, the trial court was well within its discretion in excluding this testimony. Although Rule 608(b) of the Arizona Rules of Evidence permits a trial court to allow evidence of specific instances of conduct of a witness on cross-examination if those instances are probative of the witness's character for truthfulness or untruthfulness, it also permits the discretionary exclusion of such testimony. Thus, even if we accept defendant's theory of admissibility, which is tenuous at best, the trial court justifiably excluded this line of questioning.

■ Defendant next argues that the trial court erred by admitting hearsay evidence for which no exception exists. Defendant specifically objects to Tabola's testimony concerning the victim's statements after the telephone conversation the victim presumably had with defendant from Tabola's house the night of the murder. The essence of the victim's statement to Tabola is:

I am going to meet a man who got out of jail for assault a few days ago who owes me $1100.

Reporter's transcript, March 19, 1986, at 106–07.

At trial, the prosecution argued the statements were admissible for the limited purpose of proving that a meeting between defendant and victim took place. The trial court agreed. Rule 803(3) of the Arizona Rules of Evidence permits hearsay statements "of the declarant's then existing state of mind ... (such as intent [and] plan ...)." Admittedly, the statement by the victim in this case is not as clear as if he had said: "I am going to meet Larry Prince." However, given the other evidence concerning defendant's recent release from jail on an assault charge, defendant's own statements following the same phone conversation, and evidence from the victim's account book of a debt from defendant to the victim, the trial court could properly admit the hearsay evidence to show the victim's intentions and that he acted upon his intentions. *State v. Via*, 146 Ariz. 108, 121, 704 P.2d 238, 251 (1985), *cert. denied*, 475 U.S. 1048, 106 S.Ct. 1268, 89 L.Ed.2d 577 (1986).

■ Defendant's final evidentiary argument is that the court made a series of erroneous rulings, which, taken together, constitute "cumulative error." We have never recognized a "cumulative error" theory and decline to do so now. Instead, we evaluate each of defendant's claimed errors and determine if it, independently, requires reversal. *See State v. Fleming*, 117 Ariz. 122, 128, 571 P.2d 268, 274 (1977) (*cited with approval in State v. Johnson*, 122 Ariz. 260, 274, 594 P.2d 514, 528 (1979)). Absent clear abuse of discretion, we will uphold the trial court's decisions on questions of the admissibility of evidence. *State v. Williams*, 132 Ariz. 153, 157, 644 P.2d 889, 893 (1982).

■ In this category, defendant complains of the admission of a driver's license to confirm a birthday, of the exclusion of a videotape showing a witness firing a weapon similar to the murder weapon, of leading questions and of other alleged hearsay violations. The use of the driver's license was cumulative evidence because other evidence also established the dates so any arguable error was clearly harmless. With respect to the videotape,

the trial court had considerable discretion in determining if the experiment was sufficiently similar to the conditions at the time of the shooting so as to be admissible. *State v. Mincey*, 130 Ariz. 389, 408, 636 P.2d 637, 656 (1981), *cert. denied*, 455 U.S. 1003, 102 S.Ct. 1638, 71 L.Ed.2d 871 (1982). The record indicates that the trial judge properly exercised his discretion on this point. As to the leading questions, defendant waived these objections by failing to object in a timely manner. *State v. Garcia*, 141 Ariz. 97, 101, 685 P.2d 734, 738 (1984).

## WEIGHT OF THE EVIDENCE

■ Defendant contends the verdict in this case is contrary to the weight of the evidence. His arguments relate to credibility. We will uphold the verdict below if "there exists substantial evidence from the entire record from which a rational trier of fact could have found the guilt beyond a reasonable doubt." *State v. Schad*, 129 Ariz. 557, 572, 633 P.2d 366, 381 (1981), *cert. denied*, 455 U.S. 983, 102 S.Ct. 1492, 71 L.Ed.2d 693 (1982) (quoting *State v. Tison*, 129 Ariz. 546, 553, 633 P.2d 355, 362 (1981), *cert. denied*, 459 U.S. 882, 103 S.Ct. 180, 74 L.Ed.2d 147, *reh'g denied*, 459 U.S. 1024, 103 S.Ct. 391, 74 L.Ed.2d 520 (1982)).

Among other things, the state offered credible testimony of a meeting between the defendant and the victim the night of the murder, and evidence that defendant carried a gun to that meeting. Defendant himself admits the fact of the meeting. Two other witnesses placed him at the scene. He admitted his guilt to two different persons at two different times. The evidence, taken as a whole, amply supports the verdict.

## JURY MISCONDUCT

Defendant complains of three instances of alleged juror misconduct. He alleges that one juror either perjured himself during the jury selection process or willfully failed to respond fully to questions posed by counsel. Second, he claims that another juror agreed to the guilty verdict only be-

cause of pressure imposed by other members of the jury. Third, he contends that an alternate juror participated in deliberations in place of a designated juror. On questions of juror misconduct, we will reverse only when it is clear the trial court abused its discretion by denying a new trial. *State v. Garcia,* 141 Ariz. 580, 583, 688 P.2d 206, 209 (App.1984); *State v. Rocco,* 119 Ariz. 27, 29–30, 579 P.2d 65, 67–68 (App.1978).

The trial court held an extensive evidentiary hearing on defendant's motion for a new trial based on alleged juror misconduct. With respect to the first two claims, the evidence is in sharp conflict. After considering it, the trial court denied the motion for new trial. After reviewing the record, we are satisfied he acted well within his discretion. The third claim, that an alternate juror participated in juror deliberations rather than a designated juror, was the result of a court reporter's error. In fact, the alternate juror was not present and did not participate in deliberations. Accordingly, we uphold the trial court's ruling denying a new trial based on allegations of jury misconduct.

## DEATH PENALTY

■ To be eligible for the death penalty, a defendant must have committed murder accompanied by at least one of seven aggravating factors. A.R.S. § 13–703(F). In addition, the court must consider all mitigating circumstances relevant to determining whether a sentence of death is warranted "including any aspect of the defendant's character, propensities or record and any of the circumstances of the offense." A.R.S. § 13–703(G). The state must prove the existence of aggravating circumstances beyond a reasonable doubt. *State v. Jordan,* 126 Ariz. 283, 286, 614 P.2d 825, 828, *cert. denied,* 449 U.S. 986, 101 S.Ct. 408, 66 L.Ed.2d 251 (1980). The defendant, however, bears the burden of proving mitigating circumstances, but need only do so by a preponderance of the evidence. *State v. McMurtrey,* 143 Ariz. 71, 73, 691 P.2d 1099, 1101 (1984), *appeal after remand,* 151 Ariz. 105, 726 P.2d 202 (1986), *cert. denied,*

480 U.S. 911, 107 S.Ct. 1359, 94 L.Ed.2d 530 (1987). If there is at least one aggravating factor and "no mitigating circumstances sufficiently substantial to call for leniency," the court must impose a sentence of death. A.R.S. § 13–703(E); *State v. Zaragoza,* 135 Ariz. 63, 69, 659 P.2d 22, 28, *cert. denied,* 462 U.S. 1124, 103 S.Ct. 3097, 77 L.Ed.2d 1356 (1983).

■ The trial court found only one aggravating factor: expectation of pecuniary gain. We have repeatedly held that to prove pecuniary gain, the state must show the actor anticipated receiving something of value as a result of the murder. *State v. Carriger,* 143 Ariz. 142, 161, 692 P.2d 991, 1010 (1984), *cert. denied,* 471 U.S. 1111, 105 S.Ct. 2347, 85 L.Ed.2d 864 (1985); *accord State v. LaGrand,* 153 Ariz. 21, 734 P.2d 563, *cert. denied,* — U.S. —, 108 S.Ct. 207, 98 L.Ed.2d 158 (1987); *State v. Gillies,* 135 Ariz. 500, 512, 662 P.2d 1007, 1019 (1983). It is not sufficient for purposes of this aggravating factor that the defendant gains something of value after the murder and because of it. Rather, the state must show beyond a reasonable doubt that defendant's purpose for murdering the victim was the expectation of pecuniary gain.

■ In every death penalty case, we must independently review the record to determine for ourselves whether the state proved aggravating circumstances beyond a reasonable doubt. *State v. Rossi,* 146 Ariz. 359, 365, 706 P.2d 371, 377 (1985), *appeal after remand,* 154 Ariz. 245, 741 P.2d 1223 (1987).

■ Here, the state failed to meet its burden on pecuniary gain. The state advances two arguments in support of the finding. First, the state contends that the defendant and Cobey went to the victim's apartment after the murder and stole jewelry and money and that the defendant stole jewelry at the time of the murder. The short answer on this point is that the trial judge rejected it. The trial judge did not find the existence of pecuniary gain on the basis of jewelry or money. In reviewing a death penalty, we will not consider

aggravating circumstances which were not established in the trial court. Therefore, we move to the state's second argument.

■ The trial court made its finding of pecuniary gain on a finding that defendant murdered the victim "to eliminate a financial dispute or debt owed to the victim." For purposes of this opinion, we will assume that the elimination of a financial dispute or of a debt would constitute "pecuniary value" within the meaning of A.R.S. § 13–703(F)(5).

Although the evidence demonstrates that defendant owed the victim money from drug transactions, it does not demonstrate beyond a reasonable doubt that extinguishing the debt motivated defendant to murder the victim.

The state relies on just two pieces of evidence to support the argument that defendant murdered the victim to extinguish his debt to the victim. The first is a ledger found in the victim's car. On the first written page, the ledger contains a series of columns headed by capital letters such as "AT," "TMY," and "STV." The letters "LY" head one of the columns which the state contends is an abbreviation for Larry and, presumably, Larry Prince. At the bottom of this column of numbers is the number "1250." The state argues that this number refers to the amount of money defendant owed the victim from drug transactions. In fact, defendant admitted owing the victim $1250 prior to their final meeting. On a subsequent page of the ledger, there is a similar row of columns; however, under the letters "LY" there is only the number "12.50." On the last page of the ledger there are a number of the same abbreviations; however, there is just one number under each. Many of these numbers are circled, including the one labelled "LY" with "12.50" under it. At best, this ledger confirms the victim's belief that the defendant owed him $1250, not that defendant killed the victim to extinguish the debt.

The second item of evidence relied upon by the state to prove pecuniary value is Tabola's testimony regarding the conversation between the victim and Tabola. This conversation occurred immediately following the telephone conversation the victim had, presumably with the defendant. We have discussed the admissibility of this testimony earlier in this opinion.

Tabola's testimony was admitted to show that the victim intended to meet a man recently released from jail for assault and who owed him $1100, and that he did in fact meet that man. The trial court accepted and we affirmed the state's argument that the victim was likely referring to the defendant. Therefore, the statement fit within the state of mind exception to the rule against hearsay because it helped prove the fact of the meeting. It does not show that defendant murdered the victim with the object of extinguishing his debt to the victim.

All of the state's evidence on pecuniary gain, taken together, only demonstrates that defendant owed the victim a sum of money from drug transactions and that the two of them met that evening. No statements in the record support the state's argument that defendant killed the victim to extinguish the debt; in fact, the only evidence in the record going to defendant's motivation for murdering the victim were his statements to Cobey that he was "pissed off," that "Rob didn't have his stuff or something," and that he "was going to shoot him." To qualify a defendant for the death penalty, the state must prove the aggravating circumstance beyond a reasonable doubt. This record does not demonstrate the requisite quantum of proof necessary to affirm a death penalty.

### DISPOSITION

With respect to defendant's conviction for first degree murder, we searched the record pursuant to A.R.S. § 13–4035 for fundamental error, and found none. Accordingly, we affirm the conviction. Because defendant does not meet any statutory requisite for the death penalty, his sentence is modified to life imprisonment without possibility of parole for twenty-five years pursuant to A.R.S. § 13–703(A).

The trial court imposed the death sentence and, therefore, did not consider whether defendant's sentence on the murder charge should be concurrent with or consecutive to his earlier sentence on a drug charge. The state contended that, if the sentence were life imprisonment, it should be consecutive to defendant's other sentence. Accordingly, we remand to the trial court for the sole purpose of determining whether defendant's sentences should be concurrent or consecutive.

GORDON, C.J., FELDMAN, V.C.J., and CAMERON, J., concur.

HOLOHAN, J., participated in this matter but retired prior to the filing of this opinion.

CORCORAN, J., did not participate in the determination of this matter.