861 P.2d 634

**STATE of Arizona, Appellee,**

v.

**Michael APELT, Appellant.**

**No. CR–90–0246–AP/PC.**

Supreme Court of Arizona,
En Banc.

Nov. 9, 1993.

Grant Woods, Atty. Gen. by Paul J. McMurdie, Chief Counsel, Criminal Appeals Section and Joseph T. Maziarz, Phoenix, for the State.

Robertson & Villarreal by Michael A. Villarreal and Kelly M. Robertson, Florence, for Michael Apelt.

## OPINION

MARTONE, Justice.

The defendant, Michael Apelt, was found guilty of premeditated first degree murder and conspiracy to commit first degree murder, and he was sentenced to death. The murder conviction and death sentence were automatically appealed to this court, see Rules 26.15 and 31.2(b), Ariz.R.Crim.P., and A.R.S. § 13–4031, and defendant appealed his conspiracy conviction and sentence. In addition, we granted review of the denial of defendant's petition for post-conviction relief and consolidated it with the appeal. We now affirm defendant's convictions and sentences.

## I. BACKGROUND

In August 1988, the defendant, his brother Rudi Apelt, Rudi's wife Susanne, and Michael's ex-girlfriend Anke Dorn, all German citizens, traveled to San Diego, California. The defendant and his brother met two women in a nightclub. Cheryl Rubenstein and Trudy Waters lived in Phoenix and were in San Diego to cater a party for Cheryl's brother. They spent the evening chatting with the Apelts. Because Michael's English was not very good and Rudi's was worse, communication was difficult until they found an interpreter among the other patrons of the bar. The Apelts first claimed to be wind surfing board manufacturers, then Mercedes importers. Rudi denied being married. Before leaving, the women gave the Apelts their addresses and phone numbers.

Approximately two weeks later the Apelts flew to Phoenix. Cheryl picked them up at the airport and took them to a hotel in Mesa. They soon moved to a nearby Motel 6, but pretended to be staying at the Holiday Inn, a more expensive hotel nearby. After a couple of weeks, they flew back to San Diego, picked up Anke Dorn and returned to Phoenix. Susanne, Rudi's wife, returned to Germany.

Over the next month the brothers met and "conned" a series of women, spinning tales of wealth and intrigue. The immediate goal of at least some of their ruses was to get money and other assistance. They were looking for a woman to marry Michael.

On October 6, the Apelts met Annette Clay at Bobby McGee's, a bar and restaurant. Rudi claimed to be an international banker. Annette gave him her phone number, and Rudi called her on Saturday. She met the Apelts at Bobby McGee's that evening, and introduced them to her friends, Cindy and Kathy Monkman. Michael immediately focused on Cindy and spent the evening dancing and talking with her. He said several times "you're the woman I want to marry" and "me you marry." He and Rudi claimed to be computer and banking experts.

During the next week Annette and Cindy saw the Apelts several times. When Cindy noticed that after the Apelts visited her apartment she was missing over $100 in cash, she and Annette began to get suspicious. They questioned whether the Apelts were actually staying at the Holiday Inn and, by calling several hotels in the area, discovered that the Apelts were registered at the Motel 6.

When confronted with this information, the Apelts insisted that there was some mistake. That evening, after dropping the Apelts at the Holiday Inn, the women located their room at the Motel 6 and discovered Anke Dorn.

The next day, the Apelts were furious and claimed that the women's snooping destroyed their "high security clearance" and cost them their jobs and their work visas. They explained that Anke was a family friend whose husband was in the hospital.

The women were apologetic and suggested various ways they could help the Apelts get their jobs back or find new jobs, but the Apelts refused these suggestions. Finally, in frustration, Annette exclaimed "what do you want us to do, marry you?" The Apelts replied, "yes."

Rudi moved into Annette's apartment and Michael moved into Cindy's. Annette discussed with Rudi the possibility of a sham marriage so that he could work in the United States, but Rudi insisted that he loved her and that if they married it would be forever. He also insisted that they keep the marriage secret. Rudi had been staying with Annette less than a week when Annette discovered that the story regarding Anke was a lie. Annette asked Rudi to leave and did not see him again. Rudi and Anke moved into a motel. Thereafter, Michael told Annette several times that Rudi had returned to Germany. Cindy also believed that Rudi and Anke had left the country.

On October 28, 1988, Cindy and Michael were married in Las Vegas. They did not tell anyone about the marriage. On November 7, at Michael's suggestion, they consulted Doug Ramsey about a million dollar life insurance policy. Cindy believed Michael was wealthy and that purchasing large insurance policies was a customary investment practice for couples in Germany. Ramsey informed them that they could not get such a large policy but that they might qualify for a $400,000 policy. They filled out an application, and Cindy wrote a check for the first month's premium.

Around this time, and continuing up to the time of the murder, the Apelts and Anke began a series of shopping sprees. They looked at expensive Piaget and Rolex watches, at one time contracting to buy three for a total price of approximately $130,000. They looked at expensive boats and cars, arranging to buy two Jaguars for $144,000 and two Toyota Supras for about $66,000. Their pattern was to fill out a purchase contract, make a nominal downpayment with assurances that they would pay cash upon receiving money from sources in Germany, and then never return. They drove to the stores and car dealers in Cindy's Volkswagen.

During one of the first shopping trips, Michael told Anke that if Cindy died an unnatural death, he would be rich. By this time they were without funds. Michael paid most of Rudi's and Anke's expenses with Cindy's money, even though Cindy's income from her two part-time jobs was very modest. She withdrew over $4,000 from an account from October through December 1988.

On November 25, Ramsey informed Michael and Cindy that they could only get a $100,000 life insurance policy. They executed a change form and, on November 30, applied for a $300,000 policy from another company.

Early in December, Rudi and Anke reserved a rental car for December 9, specifically requesting one with a large trunk. Around this time, Ramsey informed Cindy that the second insurance company would not approve their application for a $300,000 policy until it had more background and financial information. Cindy provided the needed information, and Ramsey resubmitted the application. In the interim, Rudi cancelled the car reservation.

On December 22, 1988, Ramsey informed Cindy and Michael that the $300,000 policy was approved and would be effective after Cindy gave him a check for the premium. He also delivered the $100,000 policy.

On the morning of December 23, Cindy and Michael took the Volkswagen in for some repairs and rented a Subaru. Cindy was busy getting ready to leave the next day for Illinois with her sister Kathy. She made plans to meet her friend Annette for dinner at 8:00 p.m. to exchange gifts. She also planned to bring along Maria, a young woman she had been counseling.

The Apelts also were busy. Michael took Rudi and Anke to a rental agency where they rented the car with the large trunk that they had originally reserved for December 9. Late in the afternoon, Michael returned to Rudi's and Anke's motel room. Michael told them that they could have a

"lot of money" if he killed Cindy. They agreed to kill Cindy that evening. They made plans to meet in front of a German restaurant and proceed from there to the desert, where Cindy would be killed. Michael stated that he would bring Cindy and make sure she could not see where they were going.

Cindy spoke with her father on the phone and then had a telephone conversation with Maria from 6:50 p.m. to 7:00 p.m. confirming that she and Michael would pick her up at 7:45 p.m. Maria heard Michael arriving in the background.

Anke and Rudi drove their rented car to the German restaurant at around 7:00 p.m. and waited. Michael drove by in the Subaru approximately 15 minutes later, but Anke did not see Cindy in the car. Anke and Rudi followed Michael on Main street toward a desert area where they had earlier practiced shooting a crossbow. Rudi turned off the road when he reached this location, but Michael continued on. Rudi drove around in the desert for a while before spotting Michael's car. He drove toward it, stopped some distance away, and got out of the car after ordering Anke to remain. He returned to the car after about five minutes and both he and Michael drove to the motel where Anke and Rudi were staying. The brothers showered and changed clothes.

The Apelts and Anke met at Bobby McGee's at 10:30 p.m. and asked for a table for four. After waiting a while, ostensibly for Michael's wife, they ordered dinner. Michael and Rudi discussed their alibi. They had several drinks after dinner in the lounge area and then went to another nightclub. Michael arrived home at around 2:00 a.m. on December 24th after leaving Rudi and Anke at their motel.

There were many calls on the answering machine from Annette, Kathy, and Maria, all of whom were worried because Cindy failed to show up for dinner or call Kathy as planned. Annette called again and spoke with Michael, who told her that Cindy left the house at around 7:00 p.m. after receiving a phone call from an angry man. He claimed that she said she had to meet someone and would meet Michael at Bobby McGee's at 10:00 p.m. Annette came over to the apartment and called the police. She noticed that Cindy's purse was still in the apartment. A police officer came and spoke with Michael and Annette. Michael told his story to the officer.

Cindy's body was found in the early afternoon of December 24th. She had been stabbed once in the lower chest and four times in the back. Her throat had been slashed so deeply that her head was nearly severed from her body. There were a tremendous number of bruises on her face and body. Police found a length of nylon cord and a blood soaked beach towel near her.

There were many tire tracks in the area, although only two were clear enough to be of use. These were consistent with the tires on the car driven by Anke and Rudi. There was also a fairly good shoe impression near the body and a partial shoe print on the victim's face as though the murderer had kicked or stepped on her head. These were later found to be consistent with a particular style of Reebok tennis shoes.

Anke and Rudi were interviewed later that day and corroborated Michael's story. They claimed they saw Cindy leaving the apartment at 7:00 p.m. as they were arriving, at which time she promised to meet them later at Bobby McGee's. When questioned, Michael denied owning tennis shoes.

Late on the evening of December 25, Rudi and Anke accompanied Michael as he drove the rented Subaru around the Salt River bottom. He drove erratically, making hard turns and slamming on the brakes in an effort to change the tread of the tires so they could not be linked to the murder scene. Two of the tires had to be replaced after the car was returned to the rental agency because they had flat spots caused by his driving.

Michael borrowed some money, using the insurance policy as collateral, and the threesome flew to Illinois for Cindy's funeral on December 31st. Although Michael cried at the funeral, Kathy saw him laugh-

ing and being jovial as he drove away after the service. That evening, Michael told Anke that Cindy had signed her own death warrant when she signed the insurance papers, but he regretted killing her.

The Apelts and Anke returned to Phoenix on January 2nd. The next morning they flew to Los Angeles and paid a homeless man $20 to record the following message over the phone and onto Cindy's answering machine:

> Hear what I have to talk. I have cut through the throat of your wife and I stabbed and more frequently in the stomach in the back with a knife. If I don't get my stuff, your girlfriend is next and then your brother and last it is you. Do it now, if not, you see what happens. My eyes are everywhere.

They then returned to Phoenix. Michael contacted Detective Davis, a police officer who spoke fluent German, and asked him to translate the message. Detective Davis listened to the message over the phone and instructed the Apelts to bring the tape to the police station the next day.

The police had discovered the insurance policy and identified Michael as a possible suspect in Cindy's murder. The bogus taped threat confirmed their suspicions and, fearing that Anke or the Apelts might leave the country, the police arranged to have a surveillance team watch them on the night of January 5. Eleven officers were deployed around the apartment complex at 5:30 p.m. Shortly after 8:30 p.m. one of the officers knocked on the Apelt's door to make sure they were home. When Michael answered the door, the officer asked for a fictitious person and was told he had the wrong apartment. Immediately after this, Rudi and Michael called the police and reported that three tall black men had just appeared at their door and threatened them. The surveillance team was contacted, and they confirmed that this had not occurred. Detective Davis told the Apelts and Anke to come to the police station the next day to make composite sketches of their assailants.

Accordingly, on January 6th, Anke and the Apelts went to the police station. The police spoke with Michael and Rudi individually and played along with them by preparing artist's sketches. After leaving Anke in the lobby for a couple of hours, the police began interrogating her. They urged her to tell the truth. They threatened her with prosecution, promised her immunity in exchange for her confession, and showed her photographs of Cindy's body in an appeal to her conscience. Anke confessed and the Apelts were arrested.

On January 9th, the police searched Cindy's apartment pursuant to a warrant. They seized a number of items, including the Apelts' shoes, the crossbow, and business cards that led the police to some of the jewelry stores and car dealerships that . the Apelts visited on their shopping sprees. They also seized two rolls of film that contained pictures of Michael wearing tennis shoes with tread matching the footprint and impression left at the murder scene.

While the brothers were in jail, Anke wrote to Rudi several times. These letters, which contained various incriminating statements reflecting Anke's version of the events surrounding the murder, were seized pursuant to two search warrants.

Michael sent Rudi a note in German that, translated, stated in part:

> I have a guy who is getting out in two-four days and then we'll be free in one to two weeks. It won't matter if the police have anything or not. We're in jail and won't be able to have done that, so don't do anything, okay! Because when a woman is dead, the same thing will have happened, we'll be free and I'll have the money because the police won't be able to do anything.

The note was intercepted by a fellow inmate and turned over to the police. After the police interviewed this inmate, they obtained and executed a search warrant of Michael's, Rudi's, and adjoining cells. Police seized other communications between the brothers, several of which were introduced at trial.

Michael and Rudi were tried separately. Anke was granted immunity from prosecution in exchange for her testimony at both

trials. Michael was convicted of both charges and sentenced to death for murder and life imprisonment for conspiracy. A notice of appeal of the murder conviction and death sentence was filed automatically by the clerk of the superior court and Michael filed a notice of appeal of his conspiracy conviction and sentence. Rudi was also convicted on both charges. *State v. Rudi Apelt,* 176 Ariz. 369, 861 P.2d 654 (1993).

## II. *ISSUES*

We will address the following issues raised in defendant's brief:

### A. *Trial Issues*

1. Did the trial court err by denying the defendant's motion for a directed verdict of acquittal?

2. Did the trial court err by failing to take any curative action after counsel alleged that four jurors saw the defendant in shackles?

3. Did the trial court err by admitting evidence of certain statements made by the victim?

4. Did the trial court err by failing to hold a *Dessureault* hearing concerning one witness' identification of the defendant as a person she saw at the airport on January 3rd?

5. Should evidence seized from the defendant's home and jail cell have been suppressed?

6. Did the trial court err by refusing to conduct an *ex parte* hearing during which the defendant could request funds for expert assistance?

### B. *Sentencing Issues*

1. Did the trial court err by refusing to fund a trip to Germany so defense counsel could look for mitigating evidence?

2. Was the death sentence appropriate?

a. Did the trial court err by finding three aggravating factors?

b. Did the trial court err by finding that there were no mitigating factors sufficient to outweigh the aggravating factors?

### C. *Post–Conviction Relief*

1. Did the trial court err by denying defendant's petition for post-conviction relief based on evidence presented at Rudi's trial that the murderer was right-handed and Michael is left-handed?

### D. *Other Issues*

In addition to the above, Michael makes the following claims of error, all of which are meritless and do not warrant separate discussion.

■ 1. Evidence of the Apelts' shopping sprees and their relationships with women should have been excluded under Rule 404(b), Ariz.R.Evid. *See State v. Romero,* 130 Ariz. 142, 144, 634 P.2d 954, 956 (1981) (trial court has broad discretion in admitting evidence of relevant prior bad acts).

■ 2. A photograph of the victim's face at the murder scene showing the shoe print on her forehead and several photos of the victim taken at the autopsy showing her wounds should have been excluded under Rule 403, Ariz.R.Evid. *See State v. Amaya–Ruiz,* 166 Ariz. 152, 170, 800 P.2d 1260, 1278 (1990) (trial court has discretion to admit photographs, and we will not disturb trial court's ruling without a clear abuse of discretion), *cert. denied,* —— U.S. ——, 111 S.Ct. 2044, 114 L.Ed.2d 129 (1991).

■ 3. The trial court should have excused for cause three jurors who indicated they had heard of the murder through the news media but could still be fair and impartial. *See State v. Comer,* 165 Ariz. 413, 426, 799 P.2d 333, 346 (1990) (the fact that juror has prior knowledge of a case is not a sufficient basis to disqualify the juror), *cert. denied,* 499 U.S. 943, 111 S.Ct. 1404, 113 L.Ed.2d 460 (1991).

■ 4. The trial court should have ordered the prosecution to obtain police reports of the California murder of an ex-girlfriend of Cindy's ex-boyfriend. *See*

Rule 15.1(d), Ariz.R.Crim.P. (extent of prosecutor's duty to obtain information); *State v. Rivera,* 152 Ariz. 507, 511, 733 P.2d 1090, 1094 (1987) (the state does not have a duty to seek out and gain possession of potentially exculpatory evidence); and Rule 15.-1(e) (showing of necessity and hardship required to obtain discovery from persons other than the state).

5. The Superior Court of Arizona in Pinal County lacked jurisdiction over the crimes charged. *See* A.R.S. § 13–109(A) ("Criminal prosecutions shall be tried in the county in which conduct constituting any element of the offense or a result of such conduct occurred, unless otherwise provided by law.").

■ 6. Evidence of various out-of-court statements made by Anke and Rudi should have been excluded because there was insufficient evidence of a conspiracy to satisfy Rule 801(d)(2)(E), Ariz.R.Evid. Defendant's claim is meritless because he did not specify which statements were erroneously admitted, and he did not direct this court to the allegedly erroneous ruling. *See State v. Carver,* 160 Ariz. 167, 175, 771 P.2d 1382, 1390 (1989) (failure to argue a claim of error on appeal results in waiver unless error is fundamental); Rule 31.13(c)(1), Ariz.R.Crim.P. (appellant's brief should contain appropriate references to the record).

7. The trial court should have excluded Annette and Kathy from the courtroom after they testified. *See* Rule 9.3(a), Ariz. R.Crim.P. (after testifying, "the witness shall be allowed to remain in the courtroom unless the court finds, upon application of a party or witness, that the presence of the witness would be prejudicial to a fair trial").

8. Evidence of various statements made by defendant to the police during the course of their investigation should have been excluded because the statements were either involuntary or obtained in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Defendant's claim is meritless because he made these statements voluntarily and before he was in police custody.

9. The trial court failed to properly instruct the jury. In our independent review of the case, we find that the jury instructions correctly stated the law.

10. The state should not have been allowed to use an accountant to summarize the deposits and expenditures of Cindy's and Michael's joint checking account. *See,* Rule 1006, Ariz.R.Evid. (summary of voluminous records).

■ 11. Arizona's death penalty statute is unconstitutional because:

(a) It does not require the trial court to make detailed factual findings in its special verdict. *See State v. Walton,* 159 Ariz. 571, 585, 769 P.2d 1017, 1031 (1989) (statute not constitutionally invalid for failing to require more detailed factual finding), *aff'd,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990).

(b) It does not require the state to prove beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors. *See State v. Correll,* 148 Ariz. 468, 484, 715 P.2d 721, 737 (1986) (Constitution does not require the state to prove that aggravation outweighs mitigation beyond a reasonable doubt).

(c) It mandates a sentence of death whenever at least one aggravating factor and no mitigating factors are found. *See State v. Gillies,* 142 Ariz. 564, 568, 691 P.2d 655, 659 (1984) (mandatory nature of Arizona's capital sentencing structure is constitutional because defendant may raise any relevant factor in mitigation), *cert. denied,* 470 U.S. 1059, 105 S.Ct. 1775, 84 L.Ed.2d 834 (1985).

(d) The discretion to balance aggravating and mitigating factors results in freakish and arbitrary imposition of the penalty. *See State v. Gretzler,* 135 Ariz. 42, 54–55, 659 P.2d 1, 13–14 (1983) (discretion given trial court does not make death penalty capricious), *cert. denied,* 461 U.S. 971, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983).

(e) The judge rather than the jury determines the existence of aggravating and mitigating factors in violation of defen-

dant's right to a jury trial and equal protection. *See Walton v. Arizona*, 497 U.S. 639, 649, 110 S.Ct. 3047, 3054–55, 111 L.Ed.2d 511 (1990) (Arizona's death penalty scheme not unconstitutional because judge makes these findings).

(f) The death penalty is per se unconstitutional because it is cruel and unnecessary to achieve the legislature's objectives. *See Gregg v. Georgia*, 428 U.S. 153, 185–87, 96 S.Ct. 2909, 2931, 49 L.Ed.2d 859 (1976) (death penalty for murder is not per se cruel and unusual).

(g) Discretion at various levels of the process results in the arbitrary imposition of the death penalty. *See McCleskey v. Kemp*, 481 U.S. 279, 296–97, 107 S.Ct. 1756, 1769–70, 95 L.Ed.2d 262 (1987) (exercise of discretion at various levels of the conviction and sentencing process does not raise constitutional concerns absent a strong showing that the discretion has been exercised in a discriminatory manner).

■ 12. The trial court should have authorized defendant to obtain information regarding all Arizona first degree murder cases so that he could prove his sentence is disproportionate. *See State v. Greenway*, 170 Ariz. 155, 171, 823 P.2d 22, 38 (1991) (not appropriate for trial court to consider sentences imposed in other cases when sentencing defendant); *State v. Salazar*, 173 Ariz. 399, 417, 844 P.2d 566, 584 (1992) (defendant not entitled to proportionality review by appellate court), *cert. denied*, — U.S. —, 113 S.Ct. 3017, 125 L.Ed.2d 707 (1993).

■ 13. The court should have ordered the prosecution to disclose all criteria and policies used to decide whether to seek the death penalty so that defendant could use this information to show his sentence is disproportionate. *Id.; see also State v. Gretzler*, 126 Ariz. 60, 92, 612 P.2d 1023, 1055 (1980) (the existence of prosecutorial discretion does not affect the validity of defendant's sentence), *cert. denied*, 461 U.S. 971, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983).

■ 14. Defendant's sentence is excessive and disproportionate. *See Salazar*, 173 Ariz. at 417, 844 P.2d at 584.

15. The trial court improperly considered sentencing recommendations made by the victim's family members that were contained in the presentence report and a victim impact statement. *See State v. Hinchey*, 165 Ariz. 432, 439–40, 799 P.2d 352, 359–60 (1990), *cert. denied*, 499 U.S. 963, 111 S.Ct. 1589, 113 L.Ed.2d 653 (1991); *State v. Fierro*, 166 Ariz. 539, 548, 804 P.2d 72, 81 (1990) (absent a showing to the contrary, we presume the trial court considered only relevant information and disregarded anything irrelevant or inflammatory).

■ 16. Defendant was denied due process because the state notified him only 5 days before the sentencing hearing that it would seek to prove the A.R.S. § 13–703(F)(4) aggravating factor. *See State v. Cook*, 170 Ariz. 40, 62–63, 821 P.2d 731, 753–54 (1992) (court's *sua sponte* consideration of the § 703(F)(8) aggravating circumstance at the sentencing hearing was not a denial of due process given defendant's failure to request a continuance and the absence of prejudice), *cert. denied*, — U.S. —, 113 S.Ct. 137, 121 L.Ed.2d 90 (1992).

17. Defendant was denied due process because the state failed to specify, before trial, the evidence upon which it intended to rely to prove aggravating factors. *See State v. Ortiz*, 131 Ariz. 195, 207, 639 P.2d 1020, 1032 (1981) (defendant only entitled to such notice "sufficiently in advance of the [sentencing] hearing that the defendant will have a reasonable opportunity to prepare rebuttal"), *cert. denied*, 456 U.S. 984, 102 S.Ct. 2259, 72 L.Ed.2d 863 (1982).

### III. *ANALYSIS*

#### A. *Trial Issues*

#### 1. *Sufficiency of the Evidence*

■ Michael claims that the trial court erred by denying his Rule 20 motion for a directed verdict of acquittal on both

the murder and conspiracy charges. We have stated:

> A judgment of acquittal is appropriate when "no substantial evidence [exists] to warrant a conviction." Substantial evidence is more than a mere scintilla and is such proof that "reasonable persons could accept as adequate and sufficient to support a conclusion of defendant's guilt beyond a reasonable doubt."

*State v. Nunez*, 167 Ariz. 272, 278, 806 P.2d 861, 867 (1991) (citations omitted). In reviewing the trial court's ruling on a Rule 20 motion we view the evidence and the inferences that can be drawn from the evidence in the light most favorable to sustaining the verdict. *State v. Guerra*, 161 Ariz. 289, 293, 778 P.2d 1185, 1189 (1989).

A.R.S. § 13–1003(A) states in relevant part: "A person commits conspiracy if, with the intent to promote or aid the commission of an offense, such person agrees with one or more persons that at least one of them or another person will engage in conduct constituting the offense." The evidence introduced at Michael's trial was more than sufficient to prove that Michael pressured Cindy into buying the life insurance policies in November with the intent to kill her and collect the proceeds. In early December, when Michael believed the $400,000 policy to be in effect, Rudi and Anke reserved a rental car with a large trunk, far more suitable for transporting a body or a bound person than Cindy's small Volkswagen was. The reservation was cancelled after Michael found out that the insurance company would not issue the large policy. Based on this evidence, the jury could find that the agreement to kill Cindy was formed between Michael and Rudi in early December. Indeed, Michael's marriage proposal to a woman just a few days after meeting her, and Rudi's attempt to get Annette to secretly marry him, suggest that a conspiracy to marry, insure, and murder someone was formed much earlier.

In any event, Michael discussed the murder with Anke and Rudi several hours before it took place, at which time Rudi agreed to participate in it. Rudi and Anke then waited in the rented car and followed Michael as he drove past. Rudi took the lead and turned off the road before Michael, demonstrating a prearranged site. This evidence alone was sufficient to support the conspiracy conviction.

A.R.S. § 13–1105(A)(1) states: "A person commits first degree murder if ... [i]ntending or knowing that his conduct will cause death, such person causes the death of another with premeditation." We have already discussed the evidence establishing Michael's intent and premeditation. The fact that the evidence does not conclusively establish whether Rudi, Michael, or both actually stabbed Cindy and caused her death is immaterial. The evidence—that Cindy's purse was left in the apartment, that nylon cord and a towel belonging to her were found with her body, that she had been beaten, and that Anke could not see her sitting in the rented Subaru—leads to the inference that Michael forcibly subdued her, bound her with the towel and cord, and transported her to the desert in the trunk or on the floor of the car. Even if we assume that Rudi actually stabbed Cindy, Michael was a major participant in her murder and could be convicted as an accomplice. *See* A.R.S. §§ 13–301, 13–303(A)(3) and 13–303(B). The jury was properly instructed on accomplice liability. The evidence was more than sufficient to support the first degree murder conviction.

## 2. Shackling of Michael

On the seventh day of trial Michael informed the trial court that four jurors saw him in shackles and handcuffs as he was being escorted from the courthouse to the jail. He claims that this exposure, and the trial court's refusal to take any corrective action, deprived him of a fair trial. He does not challenge the use of restraints, which was within the discretion of the trial court.

Precautions should be taken to keep the jury from seeing a defendant in shackles because of potential prejudice. *See State v. McMurtrey*, 136 Ariz. 93, 98, 664 P.2d 637, 642 (1983), *cert. denied*, 464

U.S. 858, 104 S.Ct. 180, 78 L.Ed.2d 161 (1983); *State v. Bracy,* 145 Ariz. 520, 532, 703 P.2d 464, 476 (1985), *cert. denied,* 474 U.S. 1110, 106 S.Ct. 898, 88 L.Ed.2d 932 (1986). Precautions were taken in this case. In spite of these precautions, however, several members of the jury allegedly saw the defendant in restraints. When such exposure is alleged, one course is for the trial court, upon request, to take some corrective action, such as questioning the jurors to determine whether they were actually prejudiced by the sight, or by giving a cautionary instruction. In this case, however, the trial court refused the defendant's request for corrective action. The court noted that the jury already knew Michael was in jail, and thus would expect some restraints. Furthermore, questioning them about it would tend to emphasize the presence of restraints. The court's determination that corrective action would do more harm than good under the circumstances of this case was well within its discretion.

■ The question is therefore whether, with or without any action by the court, having been seen in restraints deprived defendant of a fair trial. We hold that the brief and inadvertent exposure of a handcuffed or shackled defendant to members of the jury outside the courtroom is not inherently prejudicial, and the defendant is not entitled to a new trial absent a showing of actual prejudice. *See, e.g., United States v. Halliburton,* 870 F.2d 557, 560–61 (9th Cir.1989), *cert. denied,* 492 U.S. 910, 109 S.Ct. 3227, 106 L.Ed.2d 575 (1989); *United States v. Figueroa–Espinoza,* 454 F.2d 590 (9th Cir.1972); *United States v. Ware,* 897 F.2d 1538, 1541–42 (10th Cir. 1990), *cert. denied,* 496 U.S. 930, 110 S.Ct. 2629, 110 L.Ed.2d 649 (1990). No such showing has been made in this case. Even though the trial court refused to question the jurors who purportedly saw defendant in restraints, this did not preclude defendant from seeking to make an evidentiary record after trial. *See United States v. Garcia–Rosa,* 876 F.2d 209, 236 (1st Cir. 1989) (though remedial action is generally preferred, the court's refusal to poll the jury or grant mistrial after a juror saw

defendant in restraints in the hallway was not error absent a showing of prejudice; defendant could have requested a post-trial voir dire of jury), *cert. granted and judgment vacated on other grounds, Rivera–Feliciano v. United States,* 498 U.S. 954, 111 S.Ct. 377, 112 L.Ed.2d 391 (1990). The defendant made no such record. Nor has he shown us how we could find prejudice.

### 3. *Hearsay Statements*

Michael claims that the trial court erred in admitting, over a hearsay objection, some excerpts from Cindy's diary as well as her statements to the effect that: (1) Anke and Rudi were in Germany; (2) she (Cindy) had paid for their plane tickets; (3) Michael's family was very wealthy and was sending them a large sum of money; (4) it was Michael's idea to buy the life insurance; (5) life insurance was a customary investment in Germany; (6) she planned to go out with Annette and Maria on December 23 and to Illinois on December 24; and (7) she was married to Michael.

■ Many of these statements were not hearsay because they were not offered to prove the truth of the matter asserted, but for some other relevant purpose. *See* Rule 801(c), Ariz.R.Evid. Some revealed the victim's state of mind. *See* Rule 803(3), Ariz. R.Evid.

■ Even if Cindy's statement that she gave Rudi and Anke money to fly back to Germany was hearsay, its admission was harmless. The jury was informed, by other competent evidence, that the defendant, Rudi and Anke had very little money and that they subsisted mainly on Cindy's income and savings after defendant and Cindy married.

Likewise, even if Cindy's statement that she obtained the insurance policies at Michael's suggestion was hearsay, its admission was harmless. The state presented evidence that Cindy and Michael could not reasonably afford the insurance policies on her salary. When combined with evidence concerning Cindy's belief in Michael's wealth and her belief that such large insur-

362

ance policies were customary in Germany, this evidence supports the inference that Michael suggested purchasing the policies.

Finally, Cindy's statement that she had married Michael was related as part of a conversation she had with her mother on December 22nd to show when she informed her mother of her marriage. In all events, Cindy's marriage license was introduced to prove the marriage.

### 4. *Denial of Request for* Dessureault *Hearing*

▉ In the course of following up on Anke's claim that she and the Apelts flew to Los Angeles on January 3, 1989, the police showed photos of Anke and the Apelts to various persons working in the Southwest Airlines terminal. An employee of Southwest Airlines recognized defendant as someone she saw in the terminal on January 3, 1989. She testified to this at trial.

Defendant requested a *Dessureault* hearing to determine whether the identification was the result of "unduly suggestive" procedures in violation of his right to due process. *State v. Dessureault,* 104 Ariz. 380, 384, 453 P.2d 951, 955 (1969), *cert. denied,* 397 U.S. 965, 90 S.Ct. 1000, 25 L.Ed.2d 257 (1970). Defendant contends that the court erred by denying this request. We agree with the trial court that the identification in this case does not come within the ambit of *Dessureault.*

*Dessureault* deals with fairness concerns that arise when a witness (often the victim) of a crime is confronted with a live or photographic lineup and asked whether the perpetrator is among them. *See United States v. Wade,* 388 U.S. 218, 233, 87 S.Ct. 1926, 1935–36, 18 L.Ed.2d 1149 (1967) and *Stovall v. Denno,* 388 U.S. 293, 296, 87 S.Ct. 1967, 1969, 18 L.Ed.2d 1199 (1967). When this is done, the witness may well believe—consciously or unconsciously—that the police have found the perpetrator so one of the people in the lineup must be the guilty party. Thus, the witness may be motivated to pick someone, and if the defendant is the only person in the lineup who could possibly fit the perpetrator's de-

scription, there is the concern that the witness may pick the defendant for that reason.

These pressures are not present when people are asked whether they have seen certain persons in certain places or at certain times. In this context, the questioning is truly open-ended. The people questioned are not eyewitness to a crime and have no particular motivation to identify any of the people portrayed. The trial court did not err in denying the request for a hearing.

### 5. *Fourth Amendment*

Michael claims that the trial court erred in admitting, over his objection, various items of evidence that he argues were illegally seized, both from the home he shared with the victim and from the jail in which he and his brother were held.

#### a. *Items Seized From Apartment*

The apartment that defendant shared with Cindy before her death, and with his brother and Anke after her death, was searched pursuant to a warrant on January 9, 1989. Defendant does not challenge the validity of the search warrant. Instead, he claims that the police violated his Fourth Amendment rights when they seized items not listed on the warrant. He challenges the seizure of a crossbow, various business cards and the evidence to which they lead, and two rolls of film that yielded pictures of defendant wearing the inculpatory tennis shoes.

▉ As long as the warrant authorized them to be where they were, the police could seize any items that were in plain view, the evidentiary value of which was immediately apparent. *Horton v. California,* 496 U.S. 128, 135–36, 110 S.Ct. 2301, 2307–08, 110 L.Ed.2d 112 (1990); *State v. Prince,* 160 Ariz. 268, 273, 772 P.2d 1121, 1126 (1989). Because the warrant listed receipts, utility bills, and airline tickets, the police were authorized to look virtually anywhere. There is no real question that the items objected to were in plain view. The question is whether their evidentiary

value was also plain so that the officers had probable cause to seize them.

■ At the time of the search, the police were aware of Anke's claim that she and the defendants had been to the crime scene before the murder to practice with the crossbow. This made the bow potential evidence.

■ The business cards led the police to evidence of the shopping sprees. The following exchange took place between the prosecutor and the police officer:

Q You knew, did you not, that the motive for this murder or at least it was your belief at the time you executed the search warrant, was the motive was insurance; is that correct?

A Yes.

Q And then didn't—did you believe, then, that all of these business cards showing places where the defendants may have gone, showing their expensive tastes, would be evidence of this crime?

A Yes.

Q Supporting the motive of insurance?

A Yes.

(R.T. of April 18, 1990, Hearing on Motion to Suppress, at 34–35.) Another officer testified:

Our information developed through this case was that the crime occurred because of pecuniary gain. We knew that we were dealing with possible monies that would be obtained at a later time, and these business cards that were seized dealt with major companies, boats, cars, jewelry, things of that sort, and we felt that it tied in with the motive of the crime.

(*Id.* at 46.)

■ With respect to the film, the following exchange took place between the first officer and the prosecutor:

Q And you knew, did you not, that the 110 [film] belonged to Anke Dorn?

A Yes.

* * * * * *

Q Did you assume when you seized these film canisters that they were snapshots?

A Basically, yes.

Q Well, you assumed that the defendants might have been taking pictures of themselves and each other on their trip?

A Yes.

Q And did you assume, then, that they might logically have been taking pictures of their feet?

A Yes.

Q As part of their bodies?

And you were trying to ascertain whether the Defendant, Michael Apelt, had ever worn tennis shoes?

A That's correct.

(*Id.* at 37–38.) The other officer also testified that they seized the film in the belief that it would contain pictures of the defendant and possibly show him wearing tennis shoes. (*Id.* at 44.)

A trial court's ruling on a motion to suppress will not be disturbed absent a clear abuse of discretion. *State v. Carter*, 145 Ariz. 101, 110, 700 P.2d 488, 497 (1985). When reviewing a trial court's exercise of discretion, an appellate court should view the evidence in the light most favorable to the trial court's ruling. *State v. Gerlaugh*, 134 Ariz. 164, 167, 654 P.2d 800, 803 (1982). The trial court in this case acted within its discretion in denying the motion to suppress because the police gave reasonable explanations for seizing the items.

■ In addition, defendant has failed to show that the seizure of the film, even if improper, violated *his* Fourth Amendment rights. *See Rawlings v. Kentucky*, 448 U.S. 98, 104, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980) (burden is on defendant to establish that his own Fourth Amendment rights were violated by the challenged search or seizure). Evidence at the hearing established that both rolls of film were seized from Anke's bag and that the 110 film belonged to her. It is not clear who owned the 35mm film. The scope of the search was clearly legitimate, so defendant's objection must be to the seizure itself rather than to the search. However,

without an ownership or possessory interest in the bag or the film, defendant's rights were not violated by the seizure even though he had a legitimate privacy interest in the apartment as a whole. *See Horton*, 496 U.S. at 133, 110 S.Ct. at 2306 (search compromises one's interest in privacy while seizure deprives one of dominion over one's property or person). He therefore had no standing to object to the use of the evidence at trial.

### b. *Items Seized From Jail*

■ Defendant also claims that the trial court erred by admitting letters and notes—some from Anke to Rudi and some written by the brothers—that were seized from Rudi's and defendant's jail cells and persons.[1] The United States Supreme Court has held that "the Fourth Amendment's prohibition on unreasonable searches does not apply in prison cells." *Hudson v. Palmer*, 468 U.S. 517, 530, 104 S.Ct. 3194, 3202, 82 L.Ed.2d 393 (1984); *State v. Moorman*, 154 Ariz. 578, 584, 744 P.2d 679, 685 (1987). The defendant therefore has no Fourth Amendment claim.[2]

■ He argues, however, that the introduction of the letters written by Anke to Rudi violated his right to due process and deprived him of a fair trial. These letters were seized pursuant to a search warrant and contained various statements consistent with Anke's version of the events surrounding the murder. The affidavit in support of the warrant stated that the letters had been routinely opened by jail officials who then contacted the affiant, Sergeant Wesbrock. Wesbrock, who knew a little German and was involved in the investigation of Cindy's murder, determined that the letters mentioned the crime. The warrant was issued on this information and the letters were seized from Rudi's jail cell. Defendant claims that these letters were written by Anke at the suggestion of another police officer, Detective Ron Davis. Defendant implies that Davis made the suggestion with the ultimate seizure of the letters in mind.

There is nothing in the record that supports this factual contention. Defendant claims that the trial court's summary denial of his motion prevented him from making a record. The denial of a hearing, however, did not prevent him from making a record prior to trial by way of offer of proof. Rule 103(a)(2), Ariz.R.Evid. Nor was he prevented from exploring the source of the letters at trial once they were introduced by the prosecution. However, he asked no questions regarding this of either Anke or the police officer who allegedly encouraged her to write the letters.

For this reason alone, defendant's claim must fail. But even if the police officers in this case acted as defendant alleged, and even if due process were otherwise implicated, defendant was not prejudiced by the admission of the letters. They did not contain any information that was not given in Anke's testimony. They were offered by the state, on redirect examination of Anke, as prior consistent statements to rebut defendant's charges of recent fabrication. Defendant was not deprived of a fair trial.

### 6. *Denial of Request for* ex parte *Hearing*

■ Michael requested that the trial court hold an *ex parte* hearing so he could

---

1. Specifically, the following items were admitted: three letters written in German by Anke to Rudi that were seized from Rudi's jail cell, and translations of those letters (exhibits 129, 130, 131, 129A, 130A, and 131A); a piece of paper with writing on it by both Michael and Rudi that was seized from Rudi's cell (ex. 41) and a translation of Michael's writing (ex. 41A); a piece of paper with writing on it by both Michael and Rudi (ex. 42) that was seized from Michael's pocket and a translation of Michael's writing (ex. 42A); a piece of paper with Michael's writing on it in German that was seized from his jail cell (ex. 43); and a piece of paper with Michael's writing on it in German that was seized from Rudi's jail cell (ex. 44).

2. Even if the Fourth Amendment did apply, defendant's Fourth Amendment rights were potentially affected only by the seizure of the two notes found in his jail cell and his pocket. Seizure of the others from Rudi's jail cell could not have affected defendant's Fourth Amendment rights because, having released them to another's custody, he could not have a reasonable expectation of privacy in their contents.

present a request for expert assistance under A.R.S. § 13–4013 without "tipping his hand" to the prosecution. The trial court denied the request, noting that there was no authority for such a hearing. Therefore, it would violate Canon 3(A)(4) of the Code of Judicial Conduct, which forbids *ex parte* proceedings except where authorized by law. Defendant claims that this denial was error and deprived him of the opportunity to request expert assistance.

We agree with the trial court that there is no authority for granting an indigent defendant an *ex parte* hearing regarding his or her need for expert assistance. None of the cases cited by defendant establishes such a right. Federal cases are not helpful because 18 U.S.C. § 3006A(e) expressly authorizes *ex parte* applications and proceedings in federal court. We are aware of no comparable state statute. Nor do we believe that a reference to *ex parte* proceedings in *State v. Fisher*, 152 Ariz. 116, 118, 730 P.2d 825, 827 (1986) is authority for a *right* to such proceedings.

In addition, we do not believe that the Fourteenth Amendment's guarantees of due process and equal protection encompass such a right. Neither due process nor equal protection requires that the state equalize the resources of the indigent and the wealthy defendant. *Ross v. Moffitt*, 417 U.S. 600, 616, 94 S.Ct. 2437, 2447, 41 L.Ed.2d 341 (1974). Rather, they guarantee the indigent an opportunity to present his or her claims adequately and fairly. *Id.* To put it another way, they assure the indigent defendant access to the "basic tools" of an adequate defense. *Ake v. Oklahoma*, 470 U.S. 68, 77, 105 S.Ct. 1087, 1093, 84 L.Ed.2d 53 (1985).

Arizona affords the criminal defendant the right to expert assistance at county expense upon a showing of need. Given the broad disclosure required by the Arizona Rules of Criminal Procedure,[3] an *ex parte* hearing on the defendant's request

for assistance would be potentially helpful to the indigent defendant only when the expert's analysis turns out to support a position contrary to that of the defendant.

When we balance the potential benefit in some few cases against the harm inherent in *ex parte* proceedings, we cannot conclude such a proceeding is constitutionally required. It is not one of the "basic tools" of an adequate defense. We therefore hold that the trial court did not err by refusing to hold an *ex parte* hearing on defendant's need for expert assistance.

We further note that, even if defendant had a due process right to an *ex parte* hearing, he could not show prejudice from the trial court's denial of it. The trial court did not prevent defendant from presenting requests for expert assistance, as defendant claims, but merely from presenting them *ex parte*. If defendant required assistance, he should have requested it. Furthermore, if he had been prejudiced by being forced to present these requests in the presence of the state, he could then argue on appeal that his due process rights were violated.[4]

### B. *Sentencing Issues*

### 1. *Denial of Motion for Extraordinary Expenses*

After trial, defendant asked the court to authorize travel to Germany at county expense to look for mitigating evidence in preparation for sentencing. Defendant contends that the trial court erred by denying his request.

A.R.S. § 13–4013(B) provides that an indigent defendant charged with a capital offense is entitled to county-funded investigators and expert witnesses that are "reasonably necessary adequately to present his defense at trial and at any subsequent proceeding." A defendant has a due process right to such assistance upon a similar showing of necessity. *See State v.*

---

**3.** Under Rule 15.2, Ariz.R.Crim.P., the defendant must disclose all witnesses and defenses.

**4.** We note that defendant did not file his own motion for an *ex parte* hearing but joined in

Rudi's request, which was denied. Rudi's request for an expert at a hearing in which both sides were present was granted.

*Knapp,* 114 Ariz. 531, 540–41, 562 P.2d 704, 713–14 (1977) (defendant is not entitled to funds merely upon application but must make a showing, under either statute or due process clause, that the requested assistance is reasonably necessary), *cert. denied,* 435 U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 500 (1978); *Moore v. Kemp,* 809 F.2d 702, 712 (11th Cir.1987) (defendant must demonstrate how the requested assistance would be beneficial and why it is necessary for a fair trial), *cert. denied,* 481 U.S. 1054, 107 S.Ct. 2192, 95 L.Ed.2d 847 (1987). Mere "undeveloped assertions that the requested assistance would be beneficial" are not enough. *Caldwell v. Mississippi,* 472 U.S. 320, 323 n. 1, 105 S.Ct. 2633, 2637 n. 1, 86 L.Ed.2d 231 (1985). We agree with the trial court that defendant failed to make the required showing. In support of defendant's motion, counsel argued:

> Mr. Apelt has had his entire life in Germany except for the year and a half now that we know he was in the United States, and there is also the issue of that psychological hospitalization that he underwent, and I want to explore that area. Also, Your Honor, there are some other matters that came to light in his past regarding a difficult child birth, things of this sort that I need to check into, and I would ask permission to travel to Germany.

(R.T. of June 11, 1990, Motion to Continue/Motion to Authorize Extraordinary Expenses, at 7–8.) He claimed to have "leads" and that he was not "just going over there on a fishing expedition." (*Id.* at 9.) The state suggested that employment of a German investigator might be more cost-effective than a trip by counsel, but otherwise did not oppose the motion. The court expressed concern over the cost of the case and ordered defendant to submit a statement showing why the trip was necessary to obtain certain items. The statement was never filed. The court later denied the motion because defendant had failed to demonstrate that the trip was reasonably necessary to his defense.

Defendant asked that the sentencing hearing be continued because he had been unable to adequately prepare. In support of his motion, he repeated his request for expenses to travel to Germany and listed general categories of evidence he needed, such as employment and hospital records. The court denied the motion. At the end of his argument regarding mitigation, defendant mentioned three things that he had hoped to prove with records obtained from Germany: defendant's prior psychiatric hospitalization, his difficult childhood, and his low educational level.

■ Whether a defendant has made an adequate showing that assistance is reasonably necessary for his defense is left to the discretion of the trial judge. "In order to find an abuse of discretion, we must determine that the denial or restriction of investigative funds substantially prejudiced the defendant." *State v. Clabourne,* 142 Ariz. 335, 342, 690 P.2d 54, 61 (1984); *see also, State v. Amaya–Ruiz,* 166 Ariz. 152, 182, 800 P.2d 1260, 1290 (1990), *cert. denied,* — U.S. —, 111 S.Ct. 2044, 114 L.Ed.2d 129 (1991). Although defendant claimed to have a couple of "leads" as to mitigating information available in Germany, he only specifically mentioned an alleged "psychological hospitalization." He did not explain why the hospitalization might be mitigating, and he refused the court's invitation to make a more detailed showing.

In support of his motion for continuance, defendant again failed to explain what evidence was available in Germany and how it would assist him. He did not offer any reason why a difficult childhood and lack of education would be mitigating. *See State v. Wallace,* 160 Ariz. 424, 427, 773 P.2d 983, 986 (1989) (difficult family background not a mitigating factor absent a showing that it had something to do with the murder), *cert. denied,* 494 U.S. 1047, 110 S.Ct. 1513, 108 L.Ed.2d 649 (1990).

Not only did defendant fail to demonstrate reasonable necessity, but on appeal he fails to show how he was prejudiced. Defendant's claims that he had a difficult childhood and little education conflicted with his statements in the presentence report that his childhood was fairly normal

and that he had the equivalent of a high school education. Likewise, we cannot conclude that the absence of records of the alleged psychological hospitalization prejudiced defendant. He did not even consult a psychiatrist to testify regarding his probable psychological condition at the time of the murder. Instead, he submitted a letter from a doctor in Germany who stated that he had treated defendant for various illnesses during the four years prior to the murder and observed no psychological problems during that time.

Because defendant failed to show that helpful evidence was available in Germany, he had no right to county funds for the trip under the statute or the due process clause of the Fourteenth Amendment.

### 2. *Propriety of the Death Sentence*

The state has the burden of proving beyond a reasonable doubt the existence of the aggravating circumstances contained in A.R.S. § 13–703(F). A.R.S. § 13–703(C); *State v. Jordan*, 126 Ariz. 283, 286, 614 P.2d 825, 828 (1980), *cert. denied*, 449 U.S. 986, 101 S.Ct. 408, 66 L.Ed.2d 251 (1980). The defendant has the burden of proving by a preponderance of the evidence the existence of any statutory or non-statutory mitigating circumstances. A.R.S. § 13–703(C); *State v. McMurtrey*, 143 Ariz. 71, 73, 691 P.2d 1099, 1101 (1984). The trial court must impose a sentence of death if it finds at least one aggravating circumstance and no mitigating circumstances sufficient to call for leniency. A.R.S. § 13–703(E). This court does not defer to the trial court's findings on aggravating and mitigating circumstances but, rather, conducts an independent review of the propriety of the sentence. *State v. White*, 168 Ariz. 500, 510, 815 P.2d 869, 879 (1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1199, 117 L.Ed.2d 439 (1992).

### a. *Aggravating Factors*

■ The trial court found that Michael procured the commission of the offense by the promise of payment of something of pecuniary value (A.R.S. § 13–703(F)(4)), committed the offense in expectation of the receipt of something of pecuniary value (A.R.S. § 13–703(F)(5)), and committed the offense in an especially heinous, cruel or depraved manner (A.R.S. § 13–703(F)(6)).

We agree that the evidence showed beyond a reasonable doubt that defendant killed Cindy in order to receive the $400,000 insurance proceeds (§ 13–703(F)(5)). No further discussion is necessary.

We also agree that the evidence establishes beyond a reasonable doubt that Michael procured Rudi's assistance in the murder by promising him a share of the insurance proceeds, thus satisfying the § 13–703(F)(4) factor. Several hours before the murder, Michael brought the insurance papers to the motel and said they would all have a lot of money if Cindy were killed. The most reasonable inference is that Rudi agreed to assist Michael because of this promise of pecuniary gain. This is sufficient to prove that Michael "procured" Rudi's assistance.

■ Finally, we agree that Michael committed this murder in an especially cruel, heinous or depraved manner. The evidence that the victim was struck a number of times with great force, as well as the presence of her purse in the apartment and the presence of a towel and some nylon cord at the murder scene, indicates that she was forcibly subdued by the man she thought was her loving husband. She was conscious at least when initially attacked and may have remained conscious during the trip to the desert. Scrapes on her knees, suggesting that she was standing and then fell, as well as the presence of a defensive wound on one of her hands, indicate that she was conscious as she was stabbed once in the chest, four times in the back, and as her throat was slashed. This is adequate to establish that she suffered great physical and emotional pain, and thus that the murder was "especially cruel." *See State v. Walton*, 159 Ariz. 571, 586, 769 P.2d 1017, 1032 (1989) (cruelty can consist of physical abuse or mental anguish, including a victim's uncertainty as to his or her fate), *aff'd*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990). Having

found cruelty to exist, we need not discuss whether defendant's actions also indicate an extremely heinous or depraved state of mind. *State v. Wallace*, 151 Ariz. 362, 366–67, 728 P.2d 232, 236–37 (1986) (existence of any of the three elements is sufficient to constitute the § 13–703(F)(6) aggravating factor).

### b. *Mitigating Factors*

Defendant offered as mitigation a number of letters from friends and family members in Germany that discuss his good character and ask for mercy. He also introduced a document showing his brief military service, two letters from former employers that document his terms of employment and lack of work-related problems, and a letter from a doctor who stated he treated defendant for various physical illnesses between 1984 and 1988 but observed no psychological problems. He offered his age as a statutory mitigating factor and the following non-statutory mitigating factors: (1) his remorse as evidenced by his statement to Anke after Cindy's funeral that he regretted killing Cindy; (2) his cooperation with the presentence report writer; (3) his new-found religious faith; (4) his lack of a record of serious crime; (5) his honorable discharge from the army; (6) his good behavior at trial; (7) the request by Annette and Kathy contained in the presentence report that he not be sentenced to death; (8) the fact that Germany does not have the death penalty; and (9) the fact that Anke was given immunity and Rudi Apelt was offered a plea bargain.

The defendant was 25. The trial court found that this was not a mitigating factor. It went on to state:

> Finding: The defendant presented other matters for the court to consider which the court has considered which includes his alleged remorse, cooperation and good behavior, his new found religious beliefs, his military service, and other matters which appear of record, but none of which are found to be signifi-

cant mitigating factors; all of which have been considered.

(Record on Appeal at 1038.)

 Based on the special verdict, defendant claims that the trial court: (1) required that the mitigating factors be "significant" and thus subjected him to an impermissibly high burden; (2) failed to weigh the mitigating factors, as a whole, against the aggravating factors; and (3) failed to consider any of the "mitigating" factors offered by the defense that were not listed in the special verdict.

A common sense reading of the court's findings reveals that these claims are meritless. The court did not subject defendant to an impermissibly high burden or fail to weigh the factors properly. It simply found that none of the offered factors had enough mitigating effect to be "relevant in determining whether to impose a sentence less than death." A.R.S. § 13–703(G). The form of the verdict complies with the requirements of A.R.S. § 13–703(D) and is not defective because it does not discuss all the circumstances argued by the defense to be mitigating. *State v. McCall*, 160 Ariz. 119, 125, 770 P.2d 1165, 1171 (1989), *cert. denied*, 497 U.S. 1031, 110 S.Ct. 3289, 111 L.Ed.2d 798 (1990). It is clear from the record that the court considered all the circumstances offered.

 We have independently reviewed the record and agree that the defendant failed to prove any mitigating factors sufficient to call for leniency. He has failed to advance any credible argument as to why some factors should be considered mitigating at all. We note that it was in the defendant's own best interest to cooperate with the pre-sentence report writer and behave well at trial. We further note that, although the state considered offering Rudi a plea bargain, it did not do so and Rudi was in fact tried, convicted, and sentenced to death. Given the necessity of Anke's testimony and her lesser involvement in the conspiracy and murder, her more lenient treatment is not a mitigating factor. *See State v. Schurz*, 176 Ariz. 46, 57, 859 P.2d 156, 167 (1993).

Because we have found three aggravating and no mitigating factors, we find that the death sentence was properly imposed.

### c. *Post–Conviction Relief*

 An expert witness at Rudi's trial—Dr. DiMaio—testified that all of Cindy's wounds were caused by a single right-handed assailant. Evidence was introduced to show that Rudi is right-handed and Michael is left-handed. Michael filed a petition for post-conviction relief based on this "newly discovered evidence." Rule 32.1(e), Ariz.R.Crim.P. Defendant claims that the trial court erred by summarily denying the petition without an evidentiary hearing. We hold that it did not.

In *State v. Bilke*, 162 Ariz. 51, 52–53, 781 P.2d 28, 29–30 (1989), we discussed the showing that must be made in order to obtain an evidentiary hearing on a claim of newly discovered evidence:

> A defendant is entitled to an evidentiary hearing on his allegation of newly-discovered evidence if he presents a "colorable claim."

> A colorable claim in a newly-discovered evidence case is presented if the following five requirements are met: (1) the evidence must appear on its face to have existed at the time of trial but be discovered after trial; (2) the motion must allege facts from which the court could conclude the defendant was diligent in discovering the facts and bringing them to the court's attention; (3) the evidence must not simply be cumulative or impeaching; (4) the evidence must be relevant to the case; (5) *the evidence must be such that it would likely have altered the verdict, finding, or sentence if known at the time of trial.*

(Citations omitted; emphasis added.)

We need only address the last requirement because, even if the others were met, it is clear that Dr. DiMaio's testimony would not have changed the outcome of Michael's trial. The jury could have found that Michael, Rudi or both actually wielded the murder weapon. Therefore, proof that Rudi did so would make no difference in Michael's case. Even if a jury could con-

clude, based on Dr. DiMaio's testimony, that Rudi inflicted some or all of the knife wounds, the evidence was overwhelming that Michael forcibly brought Cindy to the desert with the intent of killing her or assisting in her killing. This is enough to justify both his conviction and sentence. Because defendant's petition for post-conviction relief failed to present a colorable claim, an evidentiary hearing was not warranted. The trial court properly dismissed it.

## IV. *DISPOSITION*

We have examined the record for fundamental error as required by A.R.S. § 13–4035 and find none. For the above reasons, we affirm Michael Apelt's convictions and sentences.

FELDMAN, C.J., MOELLER, V.C.J., and CORCORAN and ZLAKET, JJ., concur.